In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 15-1419

ALMA GLISSON, Personal Representative
of the Estate of NICHOLAS L. GLISSON,

*Plaintiff-Appellant*,

*v.*

INDIANA DEPARTMENT OF CORRECTIONS, *et al*.,

*Defendants-Appellees*.

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:12-cv-1418-SEB-MJD — **Sarah Evans Barker**, *Judge*.

———————————

ARGUED SEPTEMBER 7, 2016 — DECIDED FEBRUARY 21, 2017

———————————

Before WOOD, *Chief Judge*, and BAUER, POSNER, FLAUM, EASTERBROOK, KANNE, ROVNER, WILLIAMS, SYKES, and HAMILTON, *Circuit Judges*.

WOOD, *Chief Judge*. Nicholas Glisson entered the custody of the Indiana Department of Corrections on September 3, 2010, upon being sentenced for dealing in a controlled substance (selling one prescription pill to a friend who turned out to be a confidential informant). Thirty-seven days later, he

was dead from starvation, acute renal failure, and associated conditions. His mother, Alma Glisson, brought this lawsuit under 42 U.S.C. § 1983. She asserts that the medical care Glisson received at the hands of the Department's chosen provider, Correctional Medical Services, Inc. (known as Corizon) violated his rights under the Eighth Amendment to the U.S. Constitution (made applicable to the states by the Fourteenth Amendment). A panel of this court concluded that Corizon was entitled to summary judgment in its favor. See *Glisson v. Indiana Dep't of Corr.*, 813 F.3d 662 (7th Cir. 2016). The court decided to rehear the case *en banc* in order to examine the standards for corporate liability in such a case. We conclude that Glisson presented enough evidence of disputed, material issues of fact to proceed to trial, and we therefore reverse the district court's judgment.

## I

There is no doubt that Glisson had long suffered from serious health problems. He had been diagnosed with laryngeal cancer in 2003. In October of that year, he had radical surgery in which his larynx and part of his pharynx were removed, along with portions of his mandible (jawbone) and 13 teeth. He was left with a permanent stoma (that is, an opening in his throat), into which a tracheostomy tube was normally inserted. He needed a voice prosthesis to speak.

And that was not all. Glisson's 2003 surgery and follow-up radiation left his neck too weak to support his head; this in turn made his head slump forward in a way that impeded his breathing. Because physical therapy and medication for this condition were ineffective, he wore a neck brace. He also developed cervical spine damage. In 2008 doctors placed a gastrojejunostomy tube ("G-tube") in his upper abdomen for

supplemental feeding. In addition to the problems attributable to the cancer, Glisson suffered from hypothyroidism, depression, and impairments resulting from his smoking and excessive alcohol use. Finally, there was some evidence of cognitive decline.

Despite all this, Glisson was able to live independently. He learned to clean and suction his stoma. With occasional help from his mother, he was able to use his feeding tube when necessary. He was able to swallow well enough to take his food and other supplements by mouth most of the time. His hygiene was fine, and he helped with household chores such as mowing the lawn, cleaning, and cooking. He also provided care to his grandmother and his dying brother.

The events leading up to Glisson's death began when a friend, acting as a confidential informant for the police, convinced Glisson to give the friend a prescription painkiller.[1] Glisson was charged and convicted for this infraction, and on August 31, 2010, he was sentenced to a period of incarceration and transferred to the Wayne County Jail. (All relevant dates from this point onward were in 2010.) Before sentencing, Dr. Richard Borrowdale, one of his physicians, wrote a letter to the court expressing serious concern about Glisson's ability to survive in a prison setting. Dr. Borrowdale noted Glisson's se-

---

[1] It is not entirely clear from the record on appeal when this offense took place. Glisson's arrest record indicates that he was arrested for dealing in a controlled substance on July 31, 2007, and was released the same day on a $25,000 bond. The next entry is on August 31, 2010—the day he was sentenced and entered custody. The sentencing information sheet gives him one day's credit for jail time. It thus appears that the incarceration at issue in this case was based on this three-year-old arrest.

vere disabilities from cancer and alcohol dependence, his difficulty speaking because of the laryngectomy, his trouble swallowing, his severe curvature of the spine (kyphosis), and his problems walking. The conclusion of the letter was, unfortunately, prophetic: "This patient is severely disabled, and I do not feel that he would survive if he was incarcerated." Dr. William Fisher, another of Glisson's physicians, also warned that Glisson "would not do well if incarcerated."

Many of Glisson's disabilities were apparent at a glance, and his family tried to prepare him (and his custodians) for his incarceration. They brought his essential supplies, including his neck brace and the suction machine, mirror, and light that he used for his tracheostomy, to the Jail. When he was transferred on September 3 to the Reception Diagnostic Center of the Indiana Department of Corrections ("INDOC"), the Jail sent along his mirror, light, and neck brace. It is unclear what happened next to these items, but Glisson never received the neck brace, nor was he given a replacement.

At INDOC's Diagnostic Center, Glisson first came under Corizon's care, when upon his arrival Nurse Tim Sanford assessed his condition. Sanford recorded Glisson's account of his medication regimen and noted that Glisson appeared to be alert and able to communicate. Sanford noted that Glisson had a tracheostomy that had to be suctioned six times a day, and that Glisson had a feeding tube but that he took food through it only when he had difficulty swallowing. While Glisson was at the Diagnostic Center, medical personnel noted occasional problems with his blood pressure, pulse, and oxygen saturation level, as well as some signs of confusion and anger.

Several different medical providers saw Glisson while he was at the Diagnostic Center: Drs. Jill Gallien and Steven Conant (a psychiatrist); Nurses Rachel Johnson, Carla DeWalt, and Victoria Crawford; and mental health counselor Mary Serna. In addition, Health Services Administrator Kelly Kurtz contacted Glisson's mother to ask about his medical history and his behavior at home. Her inquiry was the only one that occurred throughout Glisson's incarceration, and there is no evidence that Mrs. Glisson's response (that Glisson did not behave oddly at home) was communicated to anyone else.

Ultimately the Diagnostic Center decided to place Glisson in INDOC's Plainfield Correctional Facility. Glisson was transferred there on September 17; an intake examination performed by Licensed Practical Nurse (LPN) Nikki Robinson revealed that he weighed 119 pounds and had normal vital signs. On September 21, Dr. James Mozillo ordered Glisson to be placed in the general population with a bottom-bunk pass.

Upon reaching Plainfield, Glisson's medical care—again furnished by Corizon—began to resemble the blind men's description of the elephant. A host of Corizon providers at Plainfield had a hand in Glisson's treatment. As far as we can glean from the record, they include the following: Drs. Malak Hermina (the lead physician at Plainfield), Mozillo, and Conant (again); Director of Nursing Rhonda Kessler; Registered Nurses (RNs) Mary Combs, Carol A. Griffin, Melissa Pearson, and Jennifer Hoffmeyer; LPNs Robinson, Allison M. Ortiz, and Paula J. Kuria; and mental health professional Catherine Keefer. Andy Dunnigan, Plainfield's Health Services Administrator, also played some part. We assume for the sake of argument here that none of these people, and none of the indi-

vidual providers at the Diagnostic Center, personally did anything that would qualify as "deliberate indifference" for Eighth Amendment purposes. Most of them had so little to do with Glisson that such a conclusion is quite unlikely. The question before us is instead whether, because of a deliberate policy choice pursuant to which no one was responsible for coordinating his overall care, Corizon itself violated Glisson's Eighth Amendment rights.

Predictably, given the number of actors, Glisson's care over the first few weeks of his residence at Plainfield was disjointed: no provider developed a medical treatment plan, and thus no one was able to check Glisson's progress against any such plan. In fact, for his first 24 days in INDOC custody (including the time at the Diagnostic Center), no Corizon provider even reviewed his medical history. Granted, before Glisson arrived at Plainfield, Dr. Gallien had requested his medical history on September 10. But there is no evidence that anyone responded to this request. Indeed, no one at the Center followed up, nor did anyone at Plainfield do anything until September 27, when Dr. Hermina saw Glisson and asked for the records; he received them within several hours.

At that visit, Dr. Hermina made an alarming observation about Glisson's weight. As we noted, when Glisson arrived at Plainfield he weighed only 119 pounds. On September 27, Dr. Hermina noted that Glisson appeared cachectic, which means undernourished to the point that the person has physical wasting and loss of weight and muscle mass—in a word, he is starving. See MedicineNet, Definition of Cachectic, http://www.medicinenet.com/script/main/art.asp?articlekey=40464 (last visited on February 21, as were all websites cited in this opinion). Although the medical personnel at the

Diagnostic Center had ordered the nutritional supplement Ensure for Glisson, and apparently that order carried over to Plainfield, Dr. Hermina ordered a second nutritional supplement, Jevity. Remarkably, it appears that he did not weigh Glisson—at least, there is no record of a September 27 weight. He did, however, review Glisson's earlier lab work, which showed anemia and high creatinine (a sign of impaired kidney function). Later that day, Dr. Hermina reviewed the medical records he had just received and learned that Glisson suffered from (among other things) kyphosis and back pain (for which he was treated with the opioids OxyContin and Oxycodone), gastroparesis (partial paralysis of the stomach), neck pain, and several mental conditions (depression, poor memory, mild cognitive decline).

As time went on, along with the physical problems of cachexia, renal decline, and neck weakness (in part attributable to the fact that no one ever gave him his neck brace), Glisson's mental status was deteriorating. Dr. Hermina wondered if Glisson belonged in the psychiatric unit at a different prison, but he displayed no awareness of the fact that Dr. Conant had just conducted a mental-health evaluation on Glisson on September 23. Dr. Conant's findings were worrying, but no one connected them with any of the physical data on file, such as Glisson's tendency to have inadequate oxygen profusion and his cachexia. Dr. Conant found that Glisson was restless, paranoid, delusional, hallucinating, and insomniac. He placed Glisson under close observation and settled on a diagnosis of unspecified psychosis; he saw no need for medication. (This too is odd: Glisson was actually already on psychotropic medications; while at Plainfield he was abruptly switched from Effexor to Prozac without any evaluation, weaning, or monitoring. The two drugs work quite differently, and Dr. Diane

Sommer, the expert retained by Glisson's estate, concluded that "[t]his abrupt change in medication contributed to [Glisson's] acute decline in function.")

Had Dr. Conant looked at something resembling a complete chart, he would have seen that Glisson had no history of psychosis, and he might have considered, as the post-mortem experts did, the more obvious possibility that lack of oxygen and food was affecting Glisson's mental performance. Dr. Conant noted that Glisson had been experiencing hallucinations, which the doctor thought were caused by morphine. This observation was reached in an information vacuum. In fact, as the medical records Dr. Hermina reviewed just days later show, Glisson had been on narcotic medication without adverse effects for quite a while prior to his incarceration. Had Dr. Conant known of Glisson's medical history, he would have known that morphine was an unlikely cause for the hallucinations and he would have looked further.

The Corizon providers never took any steps to integrate the growing body of evidence of Glisson's malnutrition with his overall mental and physical health. The physical signs were clear even before he arrived at Plainfield. On September 4, Glisson's urinalysis results showed the presence of ketones and leukocytes. Dr. Sommer's report notes that "[k]etones suggest the presence of other medical conditions such as anorexia, starvation, acute or severe illness and hyperthyroidism to name a few." The Corizon staff at the Diagnostic Center did nothing to address either potential problem, even though a second urine sample taken on September 5 showed an increase in ketones and leukocytes. No physician reviewed either of those lab results, despite the fact that a note dated September 5 says that Glisson was not eating and

seemed confused. Rather than probing the signs of infection, starvation, and dehydration further, the staff opted to put Glisson in the psychiatric unit under suicide watch.

The blood work at the Center continued to raise red flags. On September 9, it came back with signs of abnormal renal function. Although Glisson met with Dr. Gallien the next day, no one looked at the bloodwork until ten days after Glisson's transfer to Plainfield, at his September 27 visit with Dr. Hermina. At that point, Dr. Hermina ordered fasting labs for September 28. When the results were returned on September 29, they showed acute renal failure—information that prompted Dr. Hermina to send Glisson immediately to Wishard Hospital. Taking the facts favorably to Glisson, the record indicates that he was already slipping into renal distress as early as September 4 or 9, and that the uncoordinated care Corizon furnished was a central cause for the increasing acuteness of his condition.

Glisson was discharged from Wishard and returned to Plainfield shortly after midnight on October 7. The discharge summary included the following diagnoses:

- Acute renal failure/acidosis/hyperkalemia on top of chronic kidney disease

- Acute respiratory insufficiency/pneumonia

- Tracheoesophageal voice prosthesis replacement

- Hypothyroidism

- Malnutrition

- Squamous cell carcinoma of left lateral tongue

- Hypertension

- Chronic pain

- Dementia/psychological disorder/depression

- Pressure wound on the sacrum

The morning after Glisson's return, Dr. Hermina saw him and reviewed the Wishard summary. He ordered the continuation of the medications prescribed at Wishard. RN Griffin saw him later that day, and the next day both Dr. Hermina and several nurses saw him. LPN Ortiz noted that he did not eat any of his breakfast. In fact, Dr. Hermina had ordered G-tube feeding only (which does not seem to have happened), and so it is not clear why he had a tray.

On October 10, around 6:00 a.m., RN Combs was told that Glisson had been wandering about in a disoriented way. She tried to talk to him, but he apparently did not understand her. At 8:30 a.m., the staff notified RN Combs that Glisson was not moving and that there seemed to be blood in his bed. She found him unresponsive and called 911. The emergency team responded, and he was pronounced dead at 8:35 a.m.

The county coroner, Joseph Neuman, concluded that the cause of Glisson's death was complications from laryngeal cancer, with contributory chronic renal disease. He also observed that Glisson had extreme emaciation and cachexia. He then asked Dr. Steven Radentz, a forensic pathologist, to render a more detailed opinion. Dr. Radentz agreed with Neuman's overall assessment and added that Glisson's rapid-onset altered mental state could have resulted from hypoxia (insufficient oxygen saturation) and acute renal failure. Complications from laryngeal cancer include, Dr. Radentz said, aspiration pneumonia, acute renal failure, and hyperkalemia (elevated blood potassium, which can lead to cardiac arrest, see

MedicineNet, Definition of Hyperkalemia, http://www.medi-cinenet.com/hyperkalemia/article.htm).

## II

Alma Glisson filed this suit in state court in her capacity as Personal Representative of Glisson's Estate. She raised claims under both state law and 42 U.S.C. § 1983 against several of the doctors and nurses who were involved in Glisson's care, against INDOC, and against Corizon. The district court granted summary judgment in favor of the defendants on all of her federal claims, and it remanded the state-law claims to the state court. See *Glisson v. Indiana Dep't of Corr.*, No. 1:12-cv-1418-SEB-MJD, 2014 WL 2511579 (S.D. Ind. June 4, 2014). On appeal, Mrs. Glisson has limited her arguments to her claim against Corizon. As noted earlier, a panel of this court ruled that Mrs. Glisson failed to present enough evidence to defeat summary judgment in Corizon's favor. That conclusion rested on both a legal conclusion about what it takes to find an entity such as Corizon liable, as well as the characterization of the facts in the summary judgment record.

It is somewhat unusual to see an Eighth Amendment case relating to medical care in a prison in which the plaintiff does not argue that the individual medical provider was deliberately indifferent to a serious medical need. See *Estelle v. Gamble*, 429 U.S. 97 (1976); *Farmer v. Brennan*, 511 U.S. 825 (1994). But unusual does not mean impossible, and this case well illustrates why an organization might be liable even if its individual agents are not. Without the full picture, each person might think that her decisions were an appropriate response to a problem; her failure to situate the care within a broader context could be at worst negligent, or even grossly negligent, but not deliberately indifferent. But if institutional policies are

themselves deliberately indifferent to the quality of care pro-
vided, institutional liability is possible.

Ever since the Supreme Court decided *Monell v. New York
City Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the availability of
entity liability under section 1983 has been established. This
rule is not limited to municipal corporations, although that
was the type of entity involved in *Monell* itself. As we and our
sister circuits recognize, a private corporation that has con-
tracted to provide essential government services is subject to
at least the same rules that apply to public entities. See, *e.g.*,
*Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789–90 (7th Cir.
2014); *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir.
1982); *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408–
09 (2d Cir. 1990); *Harvey v. Harvey*, 949 F.2d 1127, 1129–30 (11th
Cir. 1992) (citing cases); *Street v. Corr. Corp. of Am.*, 102 F.3d
810, 818 (6th Cir. 1996). (We questioned in *Shields* whether pri-
vate corporations might also be subject to *respondeat superior*
liability, unlike their public counterparts, see 746 F.3d at 790–
92, but we have no need in the present case to address that
question and we thus leave it for another day.)

The critical question under *Monell*, reaffirmed in *Los Ange-
les Cnty. v. Humphries*, 562 U.S. 29 (2010), is whether a munic-
ipal (or corporate) policy or custom gave rise to the harm (that
is, caused it), or if instead the harm resulted from the acts of
the entity's agents. There are several ways in which a plaintiff
might prove this essential element. First, she might show that
"the action that is alleged to be unconstitutional implements
or executes a policy statement, ordinance, regulation, or deci-
sion officially adopted and promulgated by that body's offic-
ers." *Humphries*, 562 U.S. at 35 (quoting *Monell*, 436 U.S. at

690). Second, she might prove that the "constitutional depri-vation[] [was] visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell*, 436 U.S. at 690–91. Third, the plaintiff might be able to show that a government's policy or custom is "made … by those whose edicts or acts may fairly be said to represent official policy." *Id.* at 694. As we put the point in one case, "[a] person who wants to impose liability on a municipality for a consti-tutional tort must show that the tort was committed (that is, authorized or directed) at the policymaking level of govern-ment … ." *Vodak v. City of Chicago*, 639 F.3d 738, 747 (7th Cir. 2011). Either the content of an official policy, a decision by a final decisionmaker, or evidence of custom will suffice.

The central question is always whether an official policy, however expressed (and we have no reason to think that the list in *Monell* is exclusive), caused the constitutional depriva-tion. It does not matter if the policy was duly enacted or writ-ten down, nor does it matter if the policy counsels aggressive intervention into a particular matter or a hands-off approach. One could easily imagine either kind of strategy for a police department: one department might follow a policy of zero-tolerance for low-level drug activity in a particular area, ar-resting every small-time seller; while another department might follow a policy of by-passing the lower-level actors in favor of a focus on the kingpins. The hands-off policy is just as much a "policy" as the 100% enforcement policy is.

Mrs. Glisson asserts that Corizon had a deliberate policy not to require any kind of formal coordination of medical care either within an institution (such as the Diagnostic Center or

Plainfield) or across institutions for prisoners who are transferred. This is not the same as an allegation that Corizon was oblivious to the entire issue of care coordination. Read fairly, she is saying that Corizon consciously decided *not* to include this service, not that it had never thought about the issue and thus had nothing that could be called a policy.

In some cases, it may be difficult to tell the difference between inadvertence and a policy to omit something, but on the facts presented by Mrs. Glisson, this is not one of them. INDOC has Chronic Disease Intervention Guidelines, which explain what policies its health-care providers are required to implement. Healthcare Directive HCSD-2.06 states that each facility must adopt instructions for proper management of chronic diseases, and it spells out what those instructions should address. Among other things, it calls for "planned care in a continuous fashion" and care that is "organized and … consistent across facility lines." It specifically mandates a treatment plan for chronic cases—both an initial plan and one that is updated as care needs change. In the face of this directive, which appeared *seven years* before Glisson showed up in prison, Corizon consciously chose not to adopt the recommended policies—not for Glisson, not for anyone. As relevant to Glisson's case, it admitted that his care at INDOC was based only on general standards of medical and nursing care, not on any "written policies, procedures, or protocols." It relied on none of the Health Care Service Directives in the course of his treatment.

That in itself, of course, does not describe an Eighth Amendment violation. Nothing in the U.S. Constitution required Corizon to follow INDOC's policies. The point is a more subtle one: the existence of the INDOC Guidelines, with

which Corizon was admittedly familiar, is evidence that could persuade a trier of fact that Corizon consciously chose the approach that it took. That approach itself may or may not have led to a constitutional violation. Suppose, for instance, that the state guidelines call for a primary-care physician to coordinate all care, both basic and specialized, and a company such as Corizon decides to ignore the guidelines and instead to hire hospitalists to coordinate care. This would represent a conscious policy choice, but in all likelihood one that does not violate any inmate's constitutional rights. Moving closer to the facts of this case, it is also possible that a health-care provider's deliberate policy choice not to implement the state's guidelines does not lead to dire results. Some guidelines may be foolish or ineffective. A decision not to implement them would be a deliberate policy choice, but in such a case not one that gave rise to an Eighth Amendment violation.

Other courts have endorsed the distinction we are drawing in their decisions. For example, in *Long v. Cnty. of Los Angeles*, 442 F.3d 1178 (9th Cir. 2006), an elderly man reported to the county jail to begin serving a 120-day sentence. At that time, as his attorney informed the Director of the Jail Medical Services Division, he weighed more than 350 pounds and was suffering from congestive heart failure (among other ailments). He had been under the care of a doctor affiliated with the Department of Veterans Affairs. During the ensuing 18 days, he received uncoordinated and inadequate care, was ultimately transferred to a hospital by ambulance, but died 14 hours later. The district court granted summary judgment for the county, but the Ninth Circuit reversed. It began by acknowledging that "[a] policy can be one of action or inaction." *Id.* at 1185. The plaintiff (the decedent's widow) attacked the

county's "policies of inaction in the following areas: (1) its failure adequately to train MSB medical staff, and (2) an absence of adequate general policies to guide the medical staff's exercise of its professionally-informed discretion." *Id.* at 1190. With respect to the second ground, the court held that there was a triable issue on whether the county's failure to implement several policies amounted to deliberate indifference. *Id.*

The Third Circuit also encountered a similar case and resolved it in favor of the plaintiff: *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575 (3d Cir. 2003). In that case a diabetic inmate brought a *Monell* suit in which he asserted that he suffered a stroke because New Jersey's Prison Health Service failed to provide him with insulin. Addressing Natale's claim against the Health Service itself, the court began with the common observation that "the Natales must provide evidence that there was a relevant PHS policy or custom, and that the policy caused the constitutional violation they allege." *Id.* at 583–84. It then recalled this point from *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989):

> But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id.* at 390. The Third Circuit applied that principle to the facts before it and concluded that "[a] reasonable jury could conclude that the failure to establish a policy to address the immediate medication needs of inmates with serious medical conditions creates a risk that is sufficiently obvious as to constitute deliberate indifference to those inmates' medical needs." *Natale*, 318 F.3d at 585; see also *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004) (ex-prisoner stated claim in *Monell* suit alleging that the District's policy or custom caused constitutional violations in prison conditions and medical care; "faced with actual or constructive knowledge that its agents will probably violate constitutional rights, the city may not adopt a policy of inaction").

We are not breaking new ground in this area; to the contrary, this court has recognized these principles for years. In *Sims v. Mulcahy*, 902 F.2d 524 (7th Cir. 1990), we observed that "in situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable." *Id.* at 543 (citing *Avery v. Cnty. of Burke*, 660 F.2d 111, 114 (4th Cir. 1981); *Murray v. City of Chicago*, 634 F.2d 365, 366–67 (7th Cir. 1980)). In the same vein, we said in *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293 (7th Cir. 2010), that "in situations where rules or regulations are required to remedy a potentially dangerous practice, the County's failure to make a policy is also actionable." *Id.* at 303; see also *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (where municipality has "actual or constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction").

Notably, neither the Supreme Court in *Harris*, nor the Ninth Circuit, nor the Third Circuit, said that institutional li-

ability was possible only if the record reflected numerous examples of the constitutional violation in question. The key is whether there is a conscious decision not to take action. That can be proven in a number of ways, including but not limited to repeated actions. A single memo or decision showing that the choice not to act is deliberate could also be enough. The critical question under *Monell* remains this: is the action about which the plaintiff is complaining one of the institution itself, or is it merely one undertaken by a subordinate actor?

We reiterate that the question whether Corizon had a policy to eschew any way of coordinating care is not the only hurdle plaintiff faces: she must also prove that the approach Corizon took violated her son's constitutional rights. At trial, there is no reason why Corizon would not be entitled to introduce evidence of its track record, if it believes that this evidence will vindicate its decision not to follow the INDOC guidelines. (If it does so, it presumably would also have to face less flattering news about its record. See, *e.g.*, David Royse, "Medical battle behind bars: Big prison healthcare firm Corizon struggles to win contracts," Modern Healthcare, April 11, 2015, at http://www.modernhealthcare.com/article/20150411/MAGAZINE/304119981; Matt Stroud, "Why Are Prisoners Dying in County Jail?" Bloomberg, June 2, 2015, at https://www.bloomberg.com/news/articles/2015-06-02/why-are-prisoners-dying-in-county-jail-. That issue, like the others we have identified, must await development at a trial.)

One does not need to be an expert to know that complex, chronic illness requires comprehensive and coordinated care. In *Harris*, the Court recognized that because it is a "moral certainty" that police officers "will be required to arrest fleeing

felons," "the need to train officers in the constitutional limitations on the use of deadly force … can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." 489 U.S. at 390 n. 10. A jury could find that it was just as certain that Corizon providers would be confronted with patients with chronic illnesses, and that the need to establish protocols for the coordinated care of chronic illnesses is obvious. And in the final analysis, if a jury reasonably could find that Corizon's "policymakers … [were] deliberately indifferent to the need" for such protocols, and that the absence of protocols caused Glisson's death. *Id.* at 390.

A jury could further conclude that Corizon had actual knowledge that, without protocols for coordinated, comprehensive treatment, the constitutional rights of chronically ill inmates would sometimes be violated, and in the face of that knowledge it nonetheless "adopt[ed] a policy of inaction." *Kramer*, 680 F.3d at 1021. Finally, that jury could conclude that Corizon, indifferent to the serious risk such a course posed to chronically ill inmates, made "a deliberate choice to follow a course of action … from among various alternatives" to do nothing. *Harris*, 489 U.S. at 389. *Monell* requires no more.

In closing, we reiterate that we are not holding that the Constitution or any other source of federal law required Corizon to adopt the Directives or any other particular document. But the Constitution does require it to ensure that a well-recognized risk for a defined class of prisoners not be deliberately left to happenstance. Corizon had notice of the problems posed by a total lack of coordination. Yet despite that

knowledge, it did nothing for more than seven years to address that risk. There is no magic number of injuries that must occur before its failure to act can be considered deliberately indifferent. See *Woodward v. Corr. Med. Servs.*, 368 F.3d 917, 929 (7th Cir. 2004) ("CMS does not get a 'one free suicide' pass.").

Nicholas Glisson may not have been destined to live a long life, but he was managing his difficult medical situation successfully until he fell into the hands of the Indiana prison system and its medical-care provider, Corizon. Thirty-seven days after he entered custody and came under Corizon's care, he was dead. On this record, a jury could find that Corizon's decision not to enact centralized treatment protocols for chronically ill inmates led directly to his death. The judgment of the district court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

SYKES, *Circuit Judge*, with whom BAUER, FLAUM, and KANNE, *Circuit Judges*, join, dissenting. Today the court endorses *Monell* liability without evidence of corporate fault or causation. That contradicts long-settled principles of municipal liability under § 1983. The doctrinal shift is subtle but significant. The court rests its decision on the conceptual idea that a *gap* in official policy can sometimes be treated as an *actual* policy for purposes of municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). I have no quarrel with that as a theoretical matter. A municipality's failure to have a formal policy in place on a particular subject may represent its intentional decision *not* to have such a policy—that is, a policy *not* to have a policy—and that institutional choice may in appropriate circumstances form the basis of a *Monell* claim. The Supreme Court's cases, and ours, leave room for this theory of institutional liability under § 1983.

But identifying an official policy is just the first step in *Monell* analysis; it is not the whole ballgame. Evidence of an official policy or custom is a necessary but not sufficient condition to advance a *Monell* claim to trial. The plaintiff also must adduce evidence on two additional elements: (1) institutional fault, which in this context means the municipality's deliberate indifference to a known or obvious risk that its policy will likely lead to constitutional violations; and (2) causation. Because *Monell* doctrine applies to private corporations that contract to provide essential governmental services, *see Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789–90 (7th Cir. 2014); *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982), these requirements apply in full to Mrs. Glisson's claim against Corizon, Indiana's prison

healthcare provider, for the death of her son while in state custody.

But Mrs. Glisson produced no evidence to support the fault and causation elements of her claim. My colleagues identify none, yet they hold that a reasonable jury could find in her favor. I do not see how, without evidence on two of the three elements of the claim. The court's decision thus materially alters *Monell* doctrine in this circuit. With respect, I cannot join it.

To understand how the court's decision works a change in the law, it's helpful to begin with *Monell* itself. The familiar holding of the case is that § 1983 provides a remedy against a municipality for its *own* constitutional torts but not those of its employees or agents; the statute doesn't authorize vicarious liability under the common-law doctrine of *respondeat superior*. *Monell*, 436 U.S. at 691–92.

To separate direct-liability claims from vicarious-liability claims, the Supreme Court announced the now-canonical "policy or custom" requirement:

> Local governing bodies … can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local

> governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.

*Id.* at 690–91 (footnote omitted). Put more succinctly, *Monell* holds that when a plaintiff seeks to impose liability on a municipality under § 1983, he must have evidence that a municipal policy or custom—or the act of an authorized final policymaker, which amounts to the same thing—actually caused his constitutional injury.

But *Monell* sketched only the outlines of the doctrine; it took later decisions to fill in the details. Most pertinent here is *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397 (1997). There the Court provided a primer for how to apply *Monell* doctrine in actual practice. But first the Court elaborated on the rationale for the policy-or-custom requirement:

> Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality. Similarly, an act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability *on the theory that the relevant practice is so widespread as to have the force of law.*

*Id.* at 403–04 (emphasis added) (citation omitted).

The Court made it clear, however, that identifying an official policy or widespread custom is not sufficient to support a finding of liability:

> [I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, *a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.*

*Id.* at 404 (second emphasis added). The culpability requirement—what I've referred to as "corporate fault" or "institutional fault"—must be tied to the specific alleged constitutional violation. *Id.* at 405. The causation element requires evidence that the municipality's *own* action *directly* caused the constitutional injury.

*Brown* involved a *Monell* claim by a plaintiff who was injured when a sheriff's deputy pulled her from a car and forced her to the ground during an arrest after a high-speed chase. *Id.* at 400–01. The deputy had amassed a criminal record before joining the sheriff's department—misdemeanor convictions for battery, resisting arrest, and public drunkenness—but the sheriff hadn't reviewed it closely before hiring him. *Id.* at 401. The injured plaintiff sued the county under *Monell*, attributing her injury to the sheriff's lax hiring practices. *Id.*

The Court rejected the claim, holding that a single instance of excessive force—the plaintiff's own injury—wasn't enough to trigger municipal liability. *Id.* at 415. The Court began by tracing *Monell*'s basic requirements—an express policy or widespread custom, municipal fault, and causation—and then explained how these elements apply in different types of cases. First up were the obvious cases. The Court explained that when a *Monell* claimant alleges that "a particular municipal action *itself* violates federal law, … resolving … issues of fault and causation is straightforward." *Id.* at 404. "[P]roof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right *necessarily* establishes that the municipality acted culpably." *Id*. at 405 (emphasis added). In the same way, when a legislative decision or an act of a final policymaker *itself* violates federal law, causation is clear and nothing more is needed; in that situation the act is *necessarily* the "moving force" behind the plaintiff's injury. *Id.*

Most *Monell* claims are more complicated, however, and Mrs. Glisson's claim is not in this straightforward category. She does not contend that Corizon's failure to promulgate formal protocols for chronically ill inmates *itself* violated the Constitution. My colleagues concede the point, acknowledging that Corizon's failure to adopt protocols for chronically ill inmates "does not [in itself] describe an Eighth Amendment violation." Majority Op. at p. 15. Where, as here, the challenged policy or custom is not itself unlawful, something more is required to establish corporate culpability and causation.

Helpfully, *Brown* contains further instructions for *Monell* claims like this one that do *not* rest on allegations that a municipal policy on its face violates federal law. This part of *Brown* begins with a warning that's worth repeating here. The Court cautioned that *Monell* claims "not involving an allegation that the municipal action itself violated federal law … present much more difficult problems of proof." *Brown*, 520 U.S. at 406. Difficulties arise because claims of this type necessarily rest on the theory that a municipal policy or custom, though not itself unconstitutional, nonetheless led to constitutional torts by municipal employees acting in accordance with it. *Monell* claims in this category blur the line between municipal liability and *respondeat superior* liability; the Court worried that the line would collapse in actual practice. *Id.* at 407–08. To guard against that risk, the Court instructed the judiciary to "adhere to rigorous requirements of culpability and causation" when evaluating *Monell* claims of this kind. *Id.* at 415 ("Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability.").

More specifically, the Court held that

> a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights *must demonstrate that the municipal action was taken with deliberate indifference as to its known or obvious consequences.* A showing of simple or even heightened negligence will not suffice.

*Id.* at 407 (emphasis added) (citation omitted) (internal quotation marks omitted). For this holding the Court drew on principles announced in its earlier decision in *City of Canton v. Harris*, 489 U.S. 378 (1989), which involved a claim that shift supervisors at a city jail were inadequately trained to recognize an inmate's need for psychiatric intervention. *Brown* described *Harris*'s holding this way:

> We concluded [in *Harris*] that an "inadequate training" claim could be the basis for § 1983 liability in "limited circumstances." [489 U.S.] at 387. We spoke, however, of a deficient training "program," necessarily intended to apply over time to municipal employees. *Id.* at 390. Existence of a "program" makes proof of fault and causation at least possible in an inadequate training case. *If a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for.* Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the "deliberate indifference"—necessary to trigger municipal liability. … In addition, the existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the "moving force" behind the plaintiff's injury.

*Brown*, 520 U.S. at 407–08 (emphasis added).

*Harris*, in turn, drew on *City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985). There a plurality of the Court observed that "where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Id.* at 824 (opinion of Rehnquist, J.) (footnotes omitted).

Together these decisions stand for the proposition that a *Monell* plaintiff's own injury, without more, is insufficient to establish municipal fault and causation. The plaintiff must instead present evidence of a pattern of constitutional injuries traceable to the challenged policy or custom—or at least more than one. Only then is the record sufficient to permit an inference that the municipality was on notice that its policy or custom, though lawful on its face, had failed to prevent constitutional torts. Put slightly differently, the plaintiff's own injury, standing alone, does not permit an inference of institutional deliberate indifference to a *known* risk of constitutional violations. "Nor will it be readily apparent that the municipality's action caused the injury in question, because the plaintiff can point to no other incident tending to make it more likely that the plaintiff's own injury flows from the municipality's action, rather than from some other intervening cause." *Brown*, 520 U.S. at 408–09.

In short, except in the unusual case in which an express policy (or an act of an authorized policymaker) is *itself* unconstitutional, a *Monell* plaintiff must produce evidence of a series of constitutional injuries traceable to the challenged municipal policy or custom; the failure to do so means a

failure of proof on the fault and causation elements of the claim. *Brown* is unequivocal on this point: If the plaintiff can point *only* to his own injury, "the danger that a municipality will be held liable without fault is high" and the claim ordinarily fails. *Id.* at 408.

It's true that *Brown* and *Harris* do not foreclose the possibility that the requirement of pattern evidence might be relaxed in a narrow set of circumstances where the likelihood of recurring constitutional violations is an obvious or "highly predictable consequence" of the municipality's policy choice. *Id.* at 409–10. Addressing the inadequate-training context in particular, *Brown* acknowledged the "possibility" that "evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such violation, could trigger municipal liability." *Id.* at 409. But the Court took great pains to emphasize the narrowness of this "hypothesized" exception:

> In leaving open [in *Harris*] the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, *we simply hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations*. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding

that [the] policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right. The high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable.

*Id.* at 409–10.

Despite the contextual language, I see no reason to think that this hypothetical path to liability in the absence of pattern evidence is open *only* in failure-to-train cases. So I agree with my colleagues that evidence of repeated constitutional violations is not *always* required to advance a *Monell* claim to trial. But it's clear that this path to corporate liability is quite narrow. If the plaintiff lacks evidence of a pattern of constitutional injuries traceable to the challenged policy or custom, *Monell* liability is not possible *unless* the evidence shows that the plaintiff's situation was a recurring one (i.e., not unusual, random, or isolated) and the likelihood of constitutional injury was an obvious or highly predictable consequence of the municipality's policy choice. The Court's use of the terms "obvious" and "highly predictable" is plainly meant to limit the scope of this exception to those truly rare cases in which the policy or custom in question is so certain to produce constitutional harm that inferences of corporate deliberate indifference and causation are reasonable even in the absence of any prior injuries—that is, in the absence of the kind of evidence normally required to establish constructive notice.

Our cases have always followed this understanding of *Monell* doctrine. We have held that a gap in municipal policy can sometimes support a *Monell* claim. *See, e.g.*, *Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016); *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009); *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). But we have also recognized that claims grounded on the failure to have a policy must be scrutinized with great care. *Calhoun*, 408 F.3d at 380 ("At times, the absence of a policy might reflect a decision to act unconstitutionally, but the Supreme Court has repeatedly told us to be cautious about drawing that inference." (citing *Brown*, 520 U.S. at 409; *Harris*, 489 U.S. at 388)).

And in all cases we have consistently required *Monell* plaintiffs to produce evidence of more than one constitutional injury traceable to the challenged policy or custom (unless, of course, the policy or custom is itself unconstitutional, in which case the singular wrong to the plaintiffs is clearly attributable to the municipality rather than its employees). *See, e.g.*, *Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016) (explaining that *Monell* claims "normally require evidence that the identified practice or custom caused multiple injuries"); *Daniel v. Cook County*, 833 F.3d 728, 734 (7th Cir. 2016) (explaining that a *Monell* plaintiff "must show more than the deficiencies specific to his own experience" and allowing the claim to proceed based on a Department of Justice report documenting multiple instances of inadequate medical care in the jail); *Dixon*, 819 F.3d at 348–49 (same); *Calhoun*, 408 F.3d at 380 (explaining that a *Monell* claim ordinarily "requires more evidence than a single incident to establish liability"); *Palmer v. Marion County*, 327 F.3d 588, 596 (7th Cir. 2003) (same); *Gable v. City of Chicago*, 296 F.3d

531, 538 (7th Cir. 2002) (same); *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 531 (7th Cir. 2000) (A *Monell* plaintiff must show that "the policy itself is unconstitutional" or produce evidence of "a series of constitutional violations from which [institutional] deliberate indifference can be inferred.").

Finally, following the Supreme Court's lead in *Brown* and *Harris*, we have left open the possibility that a *Monell* claim might proceed to trial based on the plaintiff's injury alone, but only in rare cases where constitutional injury is a manifest and highly predictable consequence of the municipality's policy choice. *See Chatham*, 839 F.3d at 685–86; *Calhoun*, 408 F.3d at 381. So far, we've allowed recovery under this exception only once, in a case involving a jail healthcare provider's failure to ensure that its suicide-prevention protocols were scrupulously followed. *See Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917 (7th Cir. 2004).

To be more specific, in *Woodward* a jail's private healthcare provider had guidelines in place for inmate suicide risk identification and prevention. *Id.* at 921. An inmate committed suicide 16 days after he was booked into the jail; his estate sued the corporate healthcare provider alleging a systemic failure to enforce compliance with the guidelines. *Id.* at 919–20. The evidence at trial established that the provider neither trained its employees on how to use the guidelines nor monitored their compliance with them, and in fact had long condoned widespread violations of the nominally mandatory procedures. *Id.* at 925–29. A jury returned a verdict for the estate and we affirmed. Although there was no evidence of prior suicides at the jail, we held that *Monell* liability was appropriate because inmate suicide

is an obvious and highly predictable consequence of a jail healthcare provider's thoroughgoing failure to enforce its suicide-prevention program. *Id.* at 929.

This case is not at all like *Woodward*. While it's patently obvious that a systemic failure to enforce a jail suicide-prevention program will eventually result in inmate suicide, inmate death is not an obvious or highly predictable consequence of the alleged policy lapse at the center of this case. Mrs. Glisson claims that Corizon's failure to promulgate formal guidelines for the care of chronically ill inmates as required by INDOC Directive HCSD-2.06 caused her son's death. Everyone agrees that nothing in "the Constitution or any other source of federal law required Corizon to adopt the Directive[] or any other particular document." Majority Op. at p. 19. So *evidence* is needed to prove corporate culpability and causation; in the usual case, this means evidence of a series of prior similar injuries. But Mrs. Glisson presented no evidence that other inmates were harmed by the failure to have protocols in place as required by the Directive.

In the absence of prior injuries, Corizon was not on notice that protocols were needed to prevent constitutional torts. So Mrs. Glisson cannot prevail unless she can show that inmate death was an obvious or highly predictable consequence of the failure to promulgate formal protocols of the type specified in HCSD-2.06.

She has not done so. Her expert witness, Dr. Dianne Sommer, did not offer an opinion on the subject; the doctor's declaration states only that certain aspects of Nicholas Glisson's treatment fell below the standard of care. My colleagues insist that "[o]ne does not need to be an expert to

know that complex, chronic illness requires comprehensive and coordinated care." Majority Op. at p. 18. Perhaps not, but it's conceptually improper to frame the issue at that level of generality.

This is a complicated medical-indifference case. It's far from obvious that formal protocols of the sort required by Directive HCSD-2.06 were needed to prevent constitutional torts of the kind allegedly suffered by Nicholas Glisson. The Directive itself is entirely nonspecific. It contains only the following instructions: (1) "[o]ffenders with serious chronic health conditions need to receive planned care in a continuous fashion"; (2) chronic conditions must be identified and "a treatment plan must be established"; and (3) the treatment plan "should be maintained current" and "[a]s care needs change, the treatment plan should be updated." In other words: Have a treatment plan and update it as needed.

During discovery Mrs. Glisson asked Corizon to produce "all policies, procedures, and/or protocols relied on in developing the course of treatment for Nicholas Glisson." Corizon objected based on overbreadth and asked for a more targeted document request. Subject to the objection, Corizon gave this response: "Mr. Glisson's medical care and treatment at IDOC were based on standards of medical and nursing care, and generally were not dictated by written policies, procedures or protocols."

My colleagues do not explain how Corizon's adherence to professional standards of medical and nursing care amounts to deliberate indifference to a known or obvious risk of harm. More to the point, they do not explain how inmate death was an obvious or highly predictable consequence of Corizon's failure to promulgate protocols in

compliance with the very loose and highly generalized instructions contained in Directive HCSD-2.06. Unlike the jail-suicide case, it is neither self-evident nor predictable—let alone *highly* predictable—that Corizon's reliance on professional standards of medical and nursing care (instead of HCSD-2.06-compliant protocols) would lead to constitutional injuries of the sort suffered by Nicholas Glisson.

My colleagues say that the absence of formal protocols for chronically ill inmates created "a well-recognized risk" and "Corizon had notice of the problems posed by a total lack of coordination." Majority Op. at p. 19. No evidence supports these assertions. No expert testified that the standard of care requires a corporate healthcare provider to promulgate formal protocols on this subject, so the record doesn't even clear the bar for simple negligence. *Monell* liability requires proof of culpability significantly *greater* than simple negligence. It also requires evidence that Corizon's action—not the actions of its doctors and nurses—*directly* caused the injury. There is no such evidence here. Without the necessary evidentiary support, a jury cannot possibly draw the requisite inferences of corporate fault and causation. On this record, a verdict for Mrs. Glisson is not possible.

More broadly, by eliding the normal requirement of pattern evidence and relying instead on sweeping and unsubstantiated generalizations about the obviousness of the risk, my colleagues have significantly expanded a previously narrow exception to the general rule that a valid *Monell* claim requires evidence of prior injuries in order to establish corporate deliberate indifference and causation. The Supreme Court has instructed us to rigorously enforce the

requirements of corporate culpability and causation to ensure that municipal liability does not collapse into vicarious liability. Today's decision does not heed that instruction.

Nicholas Glisson arrived in Indiana's custody suffering from complicated and serious medical conditions. Some of Corizon's medical professionals may have been negligent in his care, as Dr. Sommer maintains, and their negligence may have hastened his death. That's a tragic outcome, to be sure; if substantiated, the wrong can be compensated in a state medical-malpractice suit. Under traditional principles of *Monell* liability, however, there is no basis for a jury to find that Corizon was deliberately indifferent to a known or obvious risk that its failure to adopt formal protocols in compliance with HCSD-2.06 would likely lead to constitutional violations. Nor is there a factual basis to find that this alleged gap in corporate policy caused Glisson's death. Accordingly, I would affirm the summary judgment for Corizon.