**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted June 30, 2020[*]
Decided June 30, 2020

**Before**

JOEL M. FLAUM, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

AMY C. BARRETT, *Circuit Judge*

No. 19-2677

| | |
|---|---|
| JAMES E. GILMAN,<br> *Plaintiff-Appellant*, | Appeal from the United States District Court for the Southern District of Indiana, Terre Haute Division. |
| *v.* | No. 2:16-cv-00194 |
| CORIZON HEALTH, INC., et al.,<br> *Defendants-Appellees*. | James R. Sweeney II, *Judge*. |

**O R D E R**

James Gilman, an Indiana inmate, appeals the entry of summary judgment against him on claims that prison health officials violated the Eighth Amendment through their deliberate indifference to his arthritis. We affirm because no reasonable jury could conclude that any defendant recklessly ignored Gilman's need for treatment.

---

[*] We have agreed to decide this case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

**I**

Gilman has arthritis in both knees. Beginning in 2010, doctors at Wabash Valley Correctional Facility gave him steroid injections every other month. In 2012, one doctor noted that, even though Gilman has had osteoarthritis "since 2001" and began receiving injections in 2010, such "[c]onservative measures have failed." This doctor therefore recommended that an orthopedic surgeon perform an evaluation, which Gilman received in 2013. The surgeon diagnosed degenerative joint disease in both knees and wrote that he recommended surgery for only the left knee because the right knee was "slightly better" than the left. According to Gilman, the surgeon orally told him that Gilman needed surgery on both knees and asked him to choose one. Gilman chose his left knee because it was in worse condition. The next month Gilman had a left-knee replacement.

Dr. Samuel Byrd began treating Gilman's knees in 2015. Gilman was still receiving steroid injections for his right knee. He reported in April "that the cortisone injection worked and relieved his symptoms." Although he was now receiving his injections every three months, once, in 2015, Gilman waited six months for an injection. The reason is disputed. Gilman attributes the delay to the fact that Dr. Byrd was the only doctor at the prison, and Gilman could not receive injections until Corizon Health, Inc., which managed the prison's healthcare, hired more staff. Dr. Byrd states that he delayed the injections because he was checking Gilman's claim that he was supposed to have surgery on his right knee and steroids would "slow the healing process" from surgery. It is undisputed that nothing in Gilman's written medical record states that the orthopedic surgeon wanted Gilman's right knee replaced.

After Dr. Byrd determined that the surgeon did not recommend surgery, he went forward with scheduling the regular injections and pursued other treatment. He sought an MRI of Gilman's knees. Corizon denied the request pending more information about Gilman's response to other treatment. Dr. Byrd then continued conservative treatment, prescribing knee braces, physical therapy, and a cane to assist Gilman with walking. Gilman's pain increased, though, leading to grievances, this lawsuit, and more treatment. A few months after Gilman sued, the orthopedic surgeon again examined him, noted that the latest conservative measures had failed, and saw that the bones in Gilman's right knee were rubbing together. The next month, Gilman's right knee was replaced.

During this suit, two experts reviewed Gilman's medical records and opined that Gilman had received reasonable medical care from Dr. Byrd, Corizon, and other medical staff. The first expert, Dr. William Kleckner, whom the defendants retained, stated that the defendants reasonably employed conservative measures in treating Gilman's arthritis in his right knee. The second, whom the district court retained at Gilman's request for an independent expert, *See* FED. R. EVID. 706, was Dr. Casey Pickerill. Dr. Pickerill agreed with Dr. Kleckner that, once Gilman began complaining about right knee pain in 2013, it was proper to use conservative treatment first:

> An understood dictum in the practice of medicine is to attempt conservative, less invasive diagnostic and/or therapeutic maneuvers first, before going on to more invasive modalities, when indicated. There are times, of course, when the acuity of the situation warrants deviation from this protocol if delay caused by a prolonged multistep algorithm could compromise the outcome (like appendectomy in the case of appendicitis.) On the other hand, chronic disease states such as degenerative joint disease, like in Mr. James Gilman's case, usually are better approached in a step-wise fashion. The standard of care actually demands that conservative therapy should be employed exhaustively when osteoarthritis is diagnosed at a young age.

When Dr. Pickerill wrote this, he had not seen the note from 2012 stating that Gilman had complained of arthritis "since 2001" (not 2013, as Dr. Pickerill thought) and the "conservative measures" used as of 2012 had "failed."

The defendants moved for summary judgment, which the district court entered. Regarding Dr. Byrd, the court saw "no evidence to support a conclusion that Dr. Byrd persisted in a course of treatment he knew was not working." Rather, "Dr. Byrd consistently provided cortisone injections when Mr. Gilman requested them and prescribed other pain medications. When Dr. Byrd thought it might be time to consider knee surgery, he requested an orthopedic consultation for Mr. Gilman." The court similarly found no evidence that the other medical staff Gilman sued had ignored his health. Finally, the court explained that Corizon did not violate the Eighth Amendment because the treatment Gilman received was "within the standard of care."

**II**

On appeal Gilman contests the entry of summary judgment, principally arguing that Dr. Byrd and Corizon recklessly delayed his access to proper care for his right knee by prioritizing administrative convenience over his medical needs. We review the entry of summary judgment de novo, construing the record and drawing all inferences in Gilman's favor. *Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016) (en banc). To survive summary judgment on his Eighth Amendment claims, Gilman must present evidence that the defendants actually knew of, but deliberately disregarded, a substantial risk of medical harm. *Id.* at 727–28; *see also Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

The record does not contain evidence from which a jury could reasonably find that Dr. Byrd was deliberately indifferent to Gilman's right-knee condition. Around the time Dr. Byrd became involved in 2015, Gilman reported to him in April that the conservative treatment of "the cortisone injection worked and relieved his symptoms" in his knee. Also, it was reasonable for Dr. Boyd to rely on Gilman's written medical record, which stated that in 2013 the orthopedic surgeon recommended only a left-knee replacement. Finally, between 2015 and 2016, Dr. Byrd prescribed added treatment to help with Gilman's right-knee pain, including a knee brace, physical therapy, and a cane. When these treatments did not work, he sent Gilman back to the orthopedic surgeon, who replaced the right knee in 2016. Based on these events, Dr. Byrd's overall care was reasonable.

Gilman offers three responses, but none justifies a trial. First, Gilman asserts that the orthopedic surgeon orally told him in 2013 that he needed surgery on both knees. But even if the surgeon said this to Gilman, Dr. Boyd reasonably relied on the written medical record, which, as we just observed, stated that the surgeon recommended only a left-knee replacement. Second, Gilman cites the medical note from 2012 stating that the "conservative treatment" of injections had at that time "failed" to resolve the arthritis pain. Because Dr. Byrd reviewed Gilman's records, we will assume that he saw this note. Even so, his maintenance of steroid injections on the right knee was not reckless. By the time Dr. Byrd began treating Gilman, Gilman was reporting relief with injections on that knee, and Dr. Byrd enhanced the injections with other measures, and eventually surgery, when the pain returned. Third, Gilman complains that he once had to wait six months for an injection. Because Gilman disputes Dr. Byrd's explanation (he was checking whether Gilman needed surgery), we will ignore it. But Gilman's explanation—that Corizon needed to hire more staff to deliver the injection—is not evidence of Dr. Byrd's recklessness. (We return to the claim against Corizon later.)

Gilman also criticizes in two respects the district court's reliance on Dr. Pickerill's report, which concluded that Gilman's care was reasonable. He argues, first, that the report focused on "common" osteoarthritis and his condition had advanced past that stage; and second, Dr. Pickerill did not have access to the note from 2012 about the failure of "conservative treatment." But even if we ignore Dr. Pickerill's report entirely, that leaves Dr. Kleckner's unrebutted report, which offered a similar opinion. It concluded that after Gilman's surgery on the left knee, the progressive forms of conservative treatment on the right knee (steroid injections, knee brace, physical therapy, and cane) was reasonable. To create a triable issue, Gilman had to adduce "affirmative evidence" that contradicted this report, not merely criticize another report with a similar opinion. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986).

Next, Gilman takes issue with the district court's decision regarding the other individual defendants—another doctor, two nurses and a medical assistant. But Gilman provides no evidence that they actually knew of any substantial risk of harm to Gilman. *Petties*, 836 F.3d at 728. So summary judgment in their favor was proper.

Finally, summary judgment for Corizon also was proper. To succeed on his Eighth Amendment claim against the company, Gilman needs to show that it had a policy or custom that caused a constitutional violation. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694–95 (1978); *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378–79 (7th Cir. 2017) (en banc) ("[A] private corporation that has contracted to provide essential government services is subject to at least the same rules that apply to public entities."). Gilman raises two arguments. First, he observes that in 2015 Corizon denied Dr. Byrd's request for an MRI. But Gilman has offered no evidence of an unreasonable policy or custom regarding MRIs. To the contrary, it is uncontested that when Corizon denied the MRI request, it reasonably asked Dr. Byrd to provide more information about Gilman's treatment. Second, he argues that insufficient staffing from Corizon in 2015 led him to miss one steroid injection. But Gilman has offered no evidence that Corizon knew that without additional staff he would miss this one injection, let alone how the missed injection might harm him. *See Petties*, 836 F.3d at 727–28. Furthermore, in 2016 Corizon authorized an orthopedic surgeon to reexamine Gilman and replace his right knee. Thus, the claim of corporate deliberate indifference fails.

We have considered Gilman's other arguments, and none has merit.

AFFIRMED