In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 19-3210

LARRY HOWELL,

*Plaintiff-Appellant,*

*v.*

WEXFORD HEALTH SOURCES, INC.
and JOHN TROST, M.D.,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:16-CV-00160-RJD — **Reona J. Daly**, *Magistrate Judge.*

———————————

ARGUED OCTOBER 2, 2020 — DECIDED FEBRUARY 5, 2021

———————————

Before RIPPLE, KANNE, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge*. This appeal presents recurring issues about the Eighth Amendment rights of incarcerated persons to have their serious medical needs treated and to obtain remedies for violations of those rights. Plaintiff Larry Howell injured his knee while playing basketball in the Menard Correctional Center. He tore his medial meniscus cartilage and his anterior cruciate ligament (ACL). Five months later, he

had surgery to repair the torn meniscus. It was another twenty months later, however, before Howell had surgery to reconstruct his ACL, despite Howell's continuing pain and efforts to have the ACL surgery sooner.

While his requests for the ACL surgery were still being rejected, Howell filed this suit under 42 U.S.C. § 1983 alleging violations of his Eighth Amendment right to be free of cruel and unusual punishment. Howell's claims for delaying the ACL surgery were tried to a jury, which ruled in favor of defendant Dr. John Trost but against defendant Wexford Health Sources, Inc. The district court later vacated the portion of the jury verdict against Wexford. The court entered judgment as a matter of law in favor of Wexford, as well as judgment for Dr. Trost based on the jury verdict.

On appeal, Howell challenges only the portion of the judgment in favor of Wexford. He argues that the district court erred by excluding his evidence of other incarcerated people's delayed orthopedic care and erred both procedurally and substantively in granting Wexford's motion for judgment as a matter of law.

We affirm. First, the district court did not abuse its discretion in excluding the evidence about Wexford's treatment of other incarcerated people. Howell did not show that their situations were fairly comparable to his. The court also did not err in granting Wexford's Rule 50(b) motion for judgment as a matter of law. As a procedural matter, Wexford properly incorporated its winning argument as one of the grounds for its Rule 50(a) motions before the verdict. Turning to substance, Howell blamed his pain and delayed surgery on Wexford's so-called "collegial review process," which requires an off-

site Wexford physician to review and approve an on-site Wexford physician's recommendation that an incarcerated person be referred to an off-site healthcare provider. The collegial review process is not unconstitutional on its face, and when we dig into the details of this case, we find that Howell did not offer evidence that would let a reasonable jury find that the collegial review process caused any violation of his Eighth Amendment rights.

I.  *Factual and Procedural History*

   A.  *Howell's Knee Injury and Treatment*

On May 4, 2014, while confined at the Menard Correctional Center, Howell suffered an acute knee injury while playing basketball. The next day, Howell saw defendant Dr. John Trost, a physician at Menard who was employed by defendant Wexford Health Sources, Inc., a private company that contracted with the State of Illinois to provide healthcare services to incarcerated people. Dr. Trost ordered an MRI of Howell's knee, which showed a torn medial meniscus and a torn ACL.

Dr. Trost referred Howell to Dr. Kevin Koth, an outside orthopedic surgeon who is not a party to this case. At Howell's initial appointment in August 2014, Dr. Koth discussed treatment options. He said that he was "not sure that doing an ACL reconstruction with a meniscal repair is in [Howell's] best interest." On October 7, 2014, Dr. Koth performed surgery to repair the meniscus tear but not the ACL.

Critical for this appeal, Dr. Koth continued to recommend against surgery to repair the ACL unless and until it became "absolutely necessary because I do not think that the rehab situation of being in prison is the most favorable for [Howell]

and, therefore, I would elect to hold off and not [do] an ACL reconstruction unless it becomes absolutely necessary." At follow-up appointments in October and November 2014, Dr. Koth continued to recommend against ACL surgery, saying that it "should be the last resort given [Howell's] current situation [in prison]."

To hold defendant Wexford itself liable for a violation of his constitutional rights, Howell seeks to show that the violation was caused by a Wexford corporate policy requiring "collegial review" before an incarcerated person can receive health care from an outside provider. In April 2015, Dr. Trost presented Howell's case for collegial review seeking an outside orthopedic evaluation of his torn ACL. The reviewing off-site Wexford physician denied it and instead recommended a physical therapy treatment plan. In November 2015, Dr. Trost again presented Howell for collegial review seeking an outside orthopedic evaluation. This too was denied. The off-site physician instead requested "more information as to what kind of therapy has been completed." In January 2016, Dr. Trost again presented Howell for collegial review to approve an MRI following his December 2015 complaints of knee pain. This referral was approved, and an MRI was performed off-site in January.

In February 2016, Dr. Trost presented Howell for collegial review, this time requesting an orthopedic consultation about those MRI results. This request was denied at first, but Dr. Trost appealed. The request was ultimately granted in March 2016. In April 2016, Howell discussed his MRI results with an outside physician's assistant who recommended proceeding with ACL reconstruction surgery. In May 2016, Dr. Trost requested and received approval for ACL surgery. Howell had

ACL reconstruction surgery on June 23, 2016, approximately twenty months after his meniscus surgery and more than two years after his injury.

B. *Procedural History*

Howell filed a complaint in the district court on February 10, 2016, shortly after the MRI that eventually led to the ACL surgery. Defendants filed motions for summary judgment, which were granted in part and denied in part. Before trial, defendants filed motions in limine, including one seeking to bar evidence of Wexford's medical treatment provided to other incarcerated people. The court granted this motion in limine on relevance grounds, ruling that the affidavits of Howell's four disclosed incarcerated witnesses did not sufficiently indicate that they would testify to issues concerning the collegial review process as it related to orthopedic injuries.

At the close of plaintiff's evidence and again when defendants rested without presenting additional evidence, defendants made oral motions under Federal Rule of Civil Procedure 50(a) for judgment as a matter of law. The court denied as to Dr. Trost and reserved decision as to Wexford. The jury returned a verdict in favor of Dr. Trost and against Wexford, awarding plaintiff damages of $25,000. After the verdict, defendants renewed their Rule 50 motions in writing. The court treated Dr. Trost's motion as moot but granted judgment as a matter of law to Wexford.

Howell has appealed the judgment in favor of Wexford but not the judgment against Dr. Trost. Howell contends that the district court erred by excluding evidence about Wexford's delays and failures in treating other patients, and by granting Wexford's Rule 50 motion. The district court had

subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 as to plaintiff's Eighth Amendment claims. This court has jurisdiction of the appeal under 28 U.S.C. § 1291.

II. *Monell Liability and the Wexford Collegial Review Process*

The district court's decisions first to exclude evidence about other incarcerated people and then to grant judgment as a matter of law are two sides of the same coin. They both stem from doctrinal requirements under § 1983 that can make it difficult for a plaintiff to prove that a private corporation like Wexford should be held liable for violating his constitutional rights. As we explain below, Howell needed to prove that a violation of his Eighth Amendment rights was caused not only by a Wexford agent or employee but by a corporate policy or widespread practice or custom. See generally *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690–91 (1978). Howell tried to meet that burden by showing that Wexford's collegial review process, which requires a second, off-site approval before referring a patient to an outside specialist, violated his rights and those of other incarcerated persons. We assume that this policy is widespread in Menard and other facilities where Wexford provides healthcare services. The question here is whether Howell offered sufficient evidence that Wexford's widespread collegial review policy caused a violation of his constitutional rights. Before engaging with the specifics of Howell's claims, some background on 42 U.S.C. § 1983 liability governed by *Monell* may be helpful.

A. *Monell Liability for Prison Healthcare Providers*

Under the Eighth Amendment, prison officials are responsible for providing healthcare to incarcerated persons who cannot obtain healthcare on their own. *Estelle v. Gamble*, 429

U.S. 97, 103–04 (1976). To prove a violation of that right, a plaintiff must prove that a defendant actually knew of a serious health need and acted with deliberate indifference to the plaintiff's suffering. *Farmer v. Brennan*, 511 U.S. 825, 843 (1994); *Gamble*, 429 U.S. at 104–05. Denying or delaying appropriate treatment to an incarcerated person suffering from avoidable pain can violate the Eighth Amendment. E.g., *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) (plaintiff stated plausible claim for deliberate indifference where jury could find that guards needlessly delayed treatment of plaintiff's broken nose for a day and a half); *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (plaintiff stated plausible claim for deliberate indifference where he was needlessly denied treatment for painful dislocated finger for two days).

Section 1983 grants a private right of action against a "person" who acts under color of state law to deprive another of rights under federal law, including the Constitution. A key part of § 1983's doctrinal structure is the difference between individual and governmental liability. In *Monroe v. Pape*, 365 U.S. 167 (1961), the Supreme Court held that an individual could be held liable under § 1983 even if his conduct violated state law. That holding opened the door to the extensive modern use of this Reconstruction-Era statute. But *Monroe* also held that a local government could not be held liable under § 1983. 365 U.S. at 187.

In *Monell*, the Supreme Court overruled the latter holding in *Monroe* and held for the first time that a municipal government could be a proper defendant under § 1983. *Monell*, 436 U.S. at 700–01. At the same time, *Monell* rejected the common-law theory of respondeat superior liability for an employee's actions. Instead, the Court crafted a new, more restrictive

standard to determine when a municipal government itself has caused a deprivation of constitutional rights. A plaintiff must show that the violation was caused by (1) an express government policy; (2) a widespread and persistent practice that amounted to a custom approaching the force of law; or (3) an official with final policymaking authority. 436 U.S. at 690–91; *Glisson v. Indiana Dep't of Correction*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc).

But Wexford is not a municipal government. It is a private corporation that contracts with the Illinois Department of Corrections to provide healthcare services that the government is obliged to provide to incarcerated persons. Circuit precedent establishes at this time that private corporations acting under color of law also benefit from *Monell*'s rejection of respondeat superior liability for an employee's constitutional violations. See *Shields v. Illinois Dep't of Corrections*, 746 F.3d 782, 786 (7th Cir. 2014) (following precedent but criticizing extension of *Monell* to private corporations). In a case against a private contractor that provides healthcare to incarcerated people, the "critical question" for liability is "whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it)." *Glisson*, 849 F.3d at 379.

As we apply controlling precedent, we may recognize that the overall doctrinal structure grew case-by-case with incremental improvisations, and that it is difficult to make sense of the overall structure. One scholar in the field expressed frustration that the

> fracturing of constitutional torts into disparate liability rules does not reflect any plausible conception of policy. Although the Court occasionally makes functional arguments about one or

another corner of this landscape, it has never at-
tempted to justify the overall structure in those
terms. Nor could it. The proliferation of incon-
sistent policies and arbitrary distinctions ren-
ders constitutional tort law functionally unintel-
ligible.

John C. Jeffries, Jr., *The Liability Rule for Constitutional Torts*, 99
Va. L. Rev. 207, 208 (2013); see also *Board of County Comm'rs of
Bryan Cty. v. Brown*, 520 U.S. 397, 430 (1997) (Breyer, J., dis-
senting) (*Monell* has "produced a highly complex body of in-
terpretive law"); Karen M. Blum, *Section 1983 Litigation: The
Maze, the Mud, and the Madness*, 23 Wm. & Mary Bill Rts. J. 913,
913–14 (2015) ("There is a growing consensus among practi-
tioners, scholars, and judges that Section 1983 is no longer
serving its original and intended function as a vehicle for rem-
edying violations of constitutional rights, that it is broken in
many ways, and that it is sorely in need of repairs."). The most
important doctrinal elaborations—individual versus official
liability, qualified immunity, and *Monell* liability rather than
respondeat superior—bear only a tenuous connection to the
text of § 1983, let alone to its history. Repair of the creaky doc-
trinal structure, however, will need to come from the Su-
preme Court or Congress. For now we do the best we can,
recognizing the challenges that parties face in asserting and
defending claims under the statute.

B.  *Isolated Incidents Versus Widespread Problems*

In applying *Monell* and avoiding respondeat superior lia-
bility, one key is to distinguish between the isolated wrong-
doing of one or a few rogue employees and other, more wide-
spread practices. *Monell*, 436 U.S. at 694. In our extensive case
law on prison healthcare, we have not adopted bright-line

rules regarding the quantity, quality, or frequency of conduct needed to prove a widespread custom or practice under *Monell*. *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). "[W]hat is needed is evidence that there is a true municipal [or corporate] policy at issue, not a random event." *Grieveson*, 538 F.3d. at 774 (quotations omitted); see also *Palmer v. Marion Cty.*, 327 F.3d 588, 596 (7th Cir. 2003) ("proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference"); *Cornfield v. Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316, 1326 (7th Cir. 1993) (requiring "a pattern or a series of incidents of unconstitutional conduct").

C.  *Proving an Unconstitutional Policy, Practice, or Custom in Prison Healthcare*

Institutional liability "can be proven in a number of ways, including but not limited to repeated actions. A single memo or decision showing that the choice *not* to act is deliberate" may establish liability under *Monell*. *Glisson*, 849 F.3d at 381 (emphasis added). "There is no magic number of injuries that must occur before [a defendant's] failure to act can be considered deliberately indifferent." *Id.* at 382.

Through a bureaucracy that diffuses individual responsibility and accountability, healthcare in a prison or jail may be delivered (or not delivered) so that it is difficult or even impossible to assign the individual responsibility for deliberately indifferent failure that offers the simplest path to § 1983 liability. See, e.g., *Daniel v. Cook Cty.*, 833 F.3d 728, 733–34 (7th Cir. 2016) (noting that individual defendants can put blame on "the system" where responsibility is so diffused that no individual is accountable for failures to provide adequate healthcare); see also *Shields*, 746 F.3d at 799 (plaintiff may be

"the victim not of any one human being's deliberate indifference but of a system of medical care that diffuse[s] responsibility for his care to the point that no single individual [is] responsible for seeing that he receive[s] the care he need[s] in a timely way"); *Hildreth v. Butler*, 960 F.3d 420, 437 (7th Cir. 2020) (Hamilton, J., dissenting) ("The law should not … reward divided responsibility and deliberate ignorance by those who control prisoners' only access to health care."). In this case, for example, the jury could reasonably find that Dr. Trost as an individual was not deliberately indifferent to Howell's pain. He repeatedly submitted Howell's case for outside diagnosis and treatment, but his requests were turned down several times through Wexford's collegial review process.

*Glisson* provided a fatal example of this sort of diffused responsibility. The plaintiff suffered from several serious illnesses that required comprehensive and coordinated care. He died of starvation, acute renal failure, and associated conditions only 37 days after he entered custody where no individual was responsible for his overall care. We held in *Glisson*, however, that a jury could conclude that Wexford had adopted what amounted to a "policy of inaction" for which Wexford itself could be held liable. *Glisson*, 849 F.3d at 382.

There are many other, less severe examples where incarcerated plaintiffs have adequately pleaded *Monell* liability alleging only their individual experiences.[1] But the more common paths toward *Monell* liability require proof either of an

---

[1] In the following cases, for example, district courts denied defendants' motions to dismiss *Monell* claims: *Haywood v. Wexford Health Sources*, 2017 WL 3168996 at *1, 4 (N.D. Ill. July 26, 2017) (alleging multiple Wexford employees' repeated indifference to plaintiff's medical needs);

express policy that is unconstitutional or a widespread practice or custom affecting other individuals or showing repeated deliberate indifference toward the plaintiff.

Despite the absence of bright-line rules, there can be little doubt that a practice or custom theory will be more persuasive if a plaintiff can show that the defendant government or company treated other, similarly situated patients in similar unconstitutional ways. For example, *Grieveson* held the plaintiff's allegations of four botched refills of his pain prescriptions did not prove a widespread unconstitutional practice. 538 F.3d at 774 ("This simply is not enough to foster a genuine issue of material fact that the practice was widespread…."). Cf. *Harper v. Wexford Health Sources*, 2016 WL 1056661 at *3–4 (N.D. Ill. Mar. 17, 2016) (denying motion to dismiss where plaintiff's specific allegations that defendant maintained a widespread cost-cutting policy were accompanied by references to experiences of other incarcerated people). We recently found that three incidents of late medication refills for an incarcerated plaintiff, resulting in painful withdrawal

---

*Baker v. Wexford Health Sources, Inc.*, 2014 WL 1346613 at *6 (N.D. Ill. Apr. 4, 2014) (plaintiff's requests for treatment of arm injury repeatedly ignored for almost eight months); *Ford v. Wexford Health Sources, Inc.*, 2013 WL 474494 at *1–3 (N.D. Ill. Feb. 7, 2013) (plaintiff alleged near daily requests for medical attention to back injury, defendants' denial of permits for sufficient medical restraints, and delays in scheduling medical appointments); *Quinn v. Hardy*, 2013 WL 4836262 at *1 (N.D. Ill. Sept. 10, 2013) (following plaintiff's foot and back injuries and Wexford employees' repeated denials of requests for treatment resulting in hunger strikes and attempted suicide); see also *Neely v. Randle*, 2013 WL 3321451 at *6 (N.D. Ill. June 29, 2013) ("[A]llegations of routine delays and denials of medical care and nonresponsiveness to requests for care, combined with … specific factual allegations regarding how he was dealt with … are sufficient to state claims under *Monell*.").

symptoms, could not survive summary judgment in part because the plaintiff failed to offer evidence of medication delays for other incarcerated people. *Hildreth*, 960 F.3d at 429 (affirming summary judgment for defendants); but see *id.* at 432, 441 (Hamilton, J., dissenting).

III. *Defendants' Motion in Limine*

With this background, we turn to Howell's first appellate challenge. To prove a *Monell* claim against Wexford for deliberate indifference to his medical needs, Howell sought to offer evidence that Wexford's collegial review process had caused four other incarcerated persons to experience similarly avoidable pain by delaying needed orthopedic care. That evidence was the target of defendants' motion in limine. The district court reviewed the four affidavits and concluded that none was a suitable comparator.

A. *Standard of Review*

We review such evidentiary rulings for abuse of discretion. *Morgan v. City of Chicago*, 822 F.3d 317, 338–40 (7th Cir. 2016), citing *Young v. James Green Mgmt., Inc.*, 327 F.3d 616 (7th Cir. 2003). "[W]e will not find error unless the court's decision is based on an erroneous conclusion of law or the record contains no evidence on which the court rationally could have based its decision…." *Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 570 (7th Cir. 1997) (noting special deference to evidentiary rulings).

In exercising that discretion in a prison healthcare case, however, a district court must take into account the burden an incarcerated plaintiff faces in asserting *Monell* claims under the Eighth Amendment. Because of the doctrinal burdens of *Monell* discussed above, a plaintiff who has direct access only

to his own medical records may well need discovery concerning the healthcare provided to others. Such discovery may also encounter issues of healthcare privacy and a need for an appropriate protective order. In deciding how far such discovery should go and whether evidence of others' treatment should be admitted at trial, employment discrimination law may provide a helpful guide.

Employees often try to prove discrimination by showing that they were treated less favorably than similarly situated employees who did not share their race, sex, religion, or other protected status. To determine whether other employees are similarly situated, "courts ask 'whether the other employees' situations were similar enough to the plaintiff's that it is reasonable to infer, in the absence of some other explanation, that the different treatment was a result of race or some other unlawful basis.'" *de Lima Silva v. Dep't of Corrections*, 917 F.3d 546, 559 (7th Cir. 2019), quoting *Luster v. Illinois Dep't of Corrections*, 652 F.3d 726, 730 (7th Cir. 2011). This inquiry is "flexible, common-sense, and factual. It asks, 'essentially, are there enough common features between the individuals to allow a meaningful comparison?'" *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012), quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), aff'd, 553 U.S. 442 (2008).

Fair comparability often presents a jury question: "While the comparability of other employees is a context-dependent question often suitable for a jury, when the facts of a case suggest that no reasonable jury could see enough commonality for a meaningful comparison between the employees, summary judgment is appropriate." *Rozumalski v. W.F. Baird & Associates, Ltd.*, 937 F.3d 919, 927 (7th Cir. 2019). In employment cases, courts look for comparators who differ primarily with

respect to the protected category, and a plaintiff typically needs only one comparator to avoid summary judgment or judgment as a matter of law. See *Humphries*, 474 F.3d at 406–07 ("A single comparator will do; numerosity is not required.").

In applying *Monell* to prison healthcare, the issue is whether the similarities show a widespread practice that supports a finding of an unconstitutional custom or practice. However, the comparator need not be perfect in either context. See, e.g., *Coleman*, 667 F.3d at 841 (concluding in employment context that comparators' "case is *close enough* to [plaintiff's] to provide a 'meaningful comparison' and to permit a reasonable jury to infer discrimination") (emphasis added), quoting *Humphries*, 474 F.3d at 405.

B. *Procedural History*

Before trial, defendants filed a motion in limine seeking to exclude "any and all argument and evidence of other medical treatment provided to inmates." In response, Howell sought to add four witnesses to his witness list. All had been incarcerated patients treated by Wexford. With his response, Howell submitted an affidavit from each to show Wexford's practice of "offering ineffective physical therapy for any and all injuries and denying outside consultations with physicians." The district court granted the motion to exclude these witnesses, finding that because the "affidavits have not indicated they would testify to issues and delays concerning the collegial review process as it relates to an orthopedic injury, their testimony is not relevant."[2]

---

[2] Howell's response to this motion in limine was the first time these four witnesses were identified, even though some of their affidavits dated

C.  *The Affidavits*

The admissibility of such evidence lies within the discretion of the trial judge, who must weigh the dangers of unfairness, confusion, and undue expenditure of time in the trial of collateral issues against the factors favoring admissibility. *Nachtsheim v. Beech Aircraft Corp.*, 847 F.2d 1261, 1269 (7th Cir. 1988) (finding no abuse of discretion in excluding evidence of other airplane accidents that were not sufficiently similar to accident at issue). In exercising that discretion, the judge may not reflexively refuse to conduct a "trial within a trial" but must consider carefully the probative value of the evidence and the offering party's need to offer it. See *id*. at 1268 (closely examining specific reasons for excluding evidence). The court must remain aware of the challenge a plaintiff faces in proving a widespread custom or practice and must give the plaintiff a fair opportunity both to discover and then to prove similar wrongs. The judge here showed that she was aware of those requirements. In the end, however, she found that Howell's evidence did not show sufficient similarity to permit a reasonable inference that Howell and these four witnesses suffered similar constitutional violations caused by a common, widespread practice.

Howell's first witness said he received inadequate physical therapy following knee surgery. Similarly, the second witness alleged knee pain and inadequate physical therapy. But neither mentioned Wexford's collegial review process; they addressed only inadequate physical therapy. The third wit-

---

from 2017. The district court did not rely on the delayed disclosure in granting the motion in limine, however, so we also bypass the timing.

ness had injured his bicep. He testified that he requested corrective surgery but was given pain medication and physical therapy instead. The problem here is that he never claimed he was denied medical care through the collegial review process, or even that a physician submitted a collegial review referral on his behalf. These first three witnesses offered essentially no relevant support for Howell's attack on Wexford's collegial review process.

The fourth witness presented a closer question. He testified that he suffered a knee injury and sought surgery, which was rejected through the collegial review process. But the declaration is sparse on details and does not include evidence of a request for collegial review. It is not even clear whether any physician ever recommended surgery for this fourth witness. A proponent seeking to demonstrate an unconstitutional harm caused by the collegial review process must present evidence that the requested treatment was medically appropriate and that denial was not justifiable. The comparator evidence is not sufficient if it relies solely on the incarcerated person's own assessment of the appropriateness of the treatment. Saying "I was unhappy with my treatment" is not enough.

Given the meager details concerning the fourth witness's condition and medical treatment, we conclude that the district court did not abuse its discretion in excluding his testimony. The *Monell* claim against Wexford challenges the collegial review process, not other aspects of prison healthcare, such as the adequacy of on-site physical therapy. Neither the fourth affidavit nor the first three showed situations similar enough to Howell's to find an abuse of discretion in excluding the witnesses.

IV. *Wexford's Rule 50(b) Motion After the Jury Verdict*

At the close of plaintiff's evidence and again at the close of all evidence, defendants made oral Rule 50(a) motions for judgment as a matter of law. The court denied the motions as to Dr. Trost's liability and reserved a decision as to Wexford's liability. The jury returned a verdict in favor of Dr. Trost and against Wexford, awarding damages of $25,000. After the verdict, defendants relied on Rule 50(b) to file written versions of their oral Rule 50(a) motions. The court found that Dr. Trost's motion was moot but granted Wexford's motion, finding that Howell had failed to offer evidence that his "experience with the collegial review process was widespread or systemic." The court then vacated the jury verdict and award and entered judgment in favor of both Wexford and Dr. Trost.

Federal Rule of Civil Procedure 50(a)(1) allows a district court to enter judgment against a party who has been fully heard on an issue during a jury trial "if a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." We engage in "rigorous and de novo review" of a district court's ruling on a Rule 50 motion. *Passananti v. Cook Cty.*, 689 F.3d 655, 659 (7th Cir. 2012). The appellate court does not weigh evidence or make credibility determinations, *id.*, and construes evidence "strictly in favor of the party who prevailed before the jury." *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 822 (7th Cir. 2016), quoting *Passananti*, 689 F.3d at 659.

A. *Procedural Challenge*

Howell argues that the district court granted Wexford's Rule 50(b) motion on a basis not raised in a Rule 50(a) motion.

A Rule 50(b) motion may be granted "only on grounds advanced in the pre-verdict motion." *Abellan v. Lavelo Property Mgmt., LLC*, 948 F.3d 820, 827 (7th Cir. 2020). Wexford argued to the judge that Howell had failed to present evidence that Wexford had an unconstitutional widespread practice or policy. Wexford incorporated its oral argument into its Rule 50(a) motion at the close of Howell's evidence, and into its Rule 50(a) motion at the close of all evidence. The court was entitled to grant Wexford's Rule 50(b) motion on grounds advanced in a pre-verdict motion under Rule 50(a).

B. *The Substance*

Howell argues that the district court erred in granting Wexford's Rule 50(b) motion because the collegial review process was a company policy or widespread practice that caused the violation of his Eighth Amendment rights. We agree with the district court that Wexford's collegial review process is not unconstitutional on its face. We recognize that the collegial review process *could* be a mechanism for denying or delaying medical care that inmates need. In this case, however, Howell did not offer evidence that would let a reasonable jury find that Wexford's collegial review process is used in a widespread or systemic way to violate constitutional rights.

1. *Howell's Experience with Collegial Review*

After Howell injured his knee, Dr. Trost requested approval for referrals to outside specialists through the collegial review process a number of times. The first led to the diagnosis of the torn meniscus and torn ACL and to Howell's first surgery to repair the torn meniscus. Earlier in this suit, Howell asserted that defendants were deliberately indifferent to his medical needs in the five months between his knee injury

and the meniscus surgery. The district court granted summary judgment for the defendants regarding those five months, and Howell does not challenge that decision on appeal. Our focus is on the twenty additional months before Howell had surgery to repair his torn ACL.

During those twenty months, Dr. Trost's requests were denied on two occasions, in April and November 2015. Both times, he sought approval for ACL reconstruction surgery. Both times the reviewing physician denied the request and directed Howell to physical therapy. It is not difficult to imagine how such denials might be deemed evidence of deliberate indifference. Howell says he was in pain, there is little evidence of a viable program of physical therapy to address his ACL tear, and avoiding surgery was likely to save money for Wexford and/or the State.

In this case, however, the undisputed evidence shows that these two denials were consistent with the medical advice from the outside orthopedic surgeon, Dr. Koth, to avoid ACL reconstruction surgery unless and until it became "absolutely necessary." This exercise of medical judgment by the outside specialist makes it difficult at best to show that Wexford's delay in going through with the surgery amounted to deliberate indifference to Howell's serious medical needs. See, e.g., *Estate of Cole v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996) (even negligent exercise of medical judgment does not show deliberate indifference; plaintiff must show decision so far outside bounds of medical judgment as to support inference that medical judgment was not actually exercised).

Undisputed evidence also shows three approvals for Howell's outside referrals through the collegial review pro-

cess during this period. First, Dr. Trost requested and received approval for a new MRI in January 2016. The next month, Dr. Trost requested an outside consultation about those MRI results. This request was initially denied, but Dr. Trost appealed and Wexford ultimately approved it. As a result, Howell consulted with an outside physician's assistant to determine whether ACL reconstruction surgery was medically needed. And third, after that medical professional recommended proceeding with ACL reconstruction surgery, Howell was approved for the surgery, which occurred in June 2016.

Howell claims an unconstitutional violation based on an alleged refusal to follow the advice of a specialist. Failure to follow the recommendations of a specialist, including for pain relief, can establish deliberate indifference. See, e.g., *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999). In this case, however, there is no evidence that Wexford personnel refused to follow the advice of a specialist, let alone that they did so pursuant to an unconstitutional policy. Again, Dr. Koth's advice to delay the ACL surgery on medical grounds is vital evidence.[3]

Even considering the evidence in the light most favorable to Howell, the delay of his ACL reconstruction surgery caused

---

[3] Howell argues that Wexford's refusal to provide a hard plastic or metal ACL brace was a refusal to follow the advice of a specialist. After Howell's meniscus repair surgery, Dr. Koth did recommend an ACL knee brace. When Howell requested the knee brace in December 2014, he received a sleeve instead of a hard plastic or metal brace. As best we can tell, the refusal was based on restrictive security protocols in the facility, not because of deliberate indifference by Wexford to Howell's medical needs.

by the collegial review process cannot be attributed to deliberate indifference. A negligent exercise of medical judgment is not enough to show deliberate indifference. Plaintiff must show a failure to exercise medical judgment at all. E.g., *Estate of Cole*, 94 F.3d at 261–62. And Howell has not shown even negligence here. It is not unusual outside of prisons for patients with painful orthopedic problems to be told to try more conservative treatment, delaying surgery until it appears that nothing less will offer effective relief. Given Dr. Koth's advice to use ACL surgery as a last resort, the Wexford doctors at worst disagreed about whether the surgery was medically appropriate. A jury could not reasonably find that this choice amounted to a failure to exercise medical judgment.[4]

## 2. *Delays in Receiving Treatment*

Howell argues that the collegial review process delayed his ability to receive treatment and that this delay itself was unconstitutional. "[T]he dangers of delayed responses to medical requests are readily apparent." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 304 (7th Cir. 2010) (affirming

---

[4] The record of Howell's knee rehabilitation and occasional complaints of pain does not reveal deliberate indifference to his medical needs. In August 2014, when Howell first saw Dr. Koth, there was no evidence of a limp, leading Dr. Koth to conclude that ACL reconstruction surgery may not be the best path. After Howell's meniscus surgery, Dr. Koth observed that his swelling had improved but that Howell complained of muscle atrophy after disuse. In December 2015, Howell complained to Wexford nursing staff of knee pain. However, one week later, Howell was observed doing full squats with approximately 300 pounds of weights. In January 2016, Wexford's Dr. Rankin reported that Howell "walks well, can do about 60% of full squat…no tenderness." And in February 2016, Howell admitted that he did not comply with the recommended physical therapy.

plaintiff's verdict in relevant part; systemic delays in receiving treatment can constitute a widespread custom or practice resulting in constitutional violations). The problem for Howell is factual. From the very beginning, the outside specialist (Dr. Koth) was reluctant to proceed with ACL surgery based on his medical judgment concerning Howell's limited ability to recover from the surgery while in prison. Throughout the months following Howell's meniscus surgery, Dr. Trost regularly submitted requests for outside treatment and diagnosis on Howell's behalf. The reviewing doctors regularly assessed whether it was yet medically appropriate or "absolutely necessary" for him to receive ACL surgery, frequently advising instead that Howell continue with the recommended physical therapy.

Howell's situation is distinguishable from *Shields*, where delay made the necessary shoulder surgery impossible and resulted in a serious and permanent impairment that could have been avoided. *Shields v. Illinois Dep't of Corrections*, 746 F.3d 782, 785 (7th Cir. 2014) (affirming summary judgment for Wexford because isolated incidents such as a referral to the wrong doctor and a failure to promptly discipline for that mistake did not add up to a pattern to support an inference of unconstitutional custom or practice under *Monell*). Howell ultimately did receive ACL reconstruction surgery. There is no evidence that the delay resulted in permanent impairment.

Not treating pain *can* be an Eighth Amendment violation, of course, even if it is a matter of only minutes or hours. See, e.g., *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) ("The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency...."); *Grieveson v. Anderson*, 538 F.3d 763, 778–80 (7th Cir. 2008) (guards could be liable for delaying

treatment for painful broken nose by at least a day and a half); *Edwards v. Snyder*, 478 F.3d 827, 830–32 (7th Cir. 2007) (plaintiff stated a claim against prison doctor for deliberate indifference after two-day delay in treatment for open dislocated finger for no medical reason); *Cooper v. Casey*, 97 F.3d 914, 916–17 (7th Cir. 1996) (presenting jury question "whether the plaintiffs were in sufficient pain to entitle them to pain medication within the first 48 hours after the beating"). But the evidence shows beyond reasonable dispute here that decisions about how best to treat Howell's knee were based on medical judgment, primarily Dr. Koth's recommendation to proceed to ACL surgery only if and when it became "absolutely necessary." With that in mind, the delays caused by Wexford's collegial review process do not show deliberate indifference to Howell's medical needs.

One final note: Howell also argued on appeal that the district court erred by granting defendants judgment as a matter of law on his demands for punitive damages. Howell points out that we have said that the high deliberate-indifference standard for liability under the Eighth Amendment is not lower than the standard for punitive damages. See *Walsh v. Mellas*, 837 F.2d 789, 801–02 (7th Cir. 1988). Because defendants are entitled to judgment as to liability, however, we need not reach the issue of punitive damages.

The judgment of the district court is AFFIRMED.