In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 19-1767

MICHAEL THOMAS,

*Plaintiff-Appellant,*

*v.*

ALINE MARTIJA, *et al.,*

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 15 C 7187 — **Rebecca R. Pallmeyer**, *Chief Judge.*

———————————

ARGUED OCTOBER 28, 2020 — DECIDED MARCH 16, 2021

———————————

Before RIPPLE, WOOD, and BRENNAN, *Circuit Judges.*

WOOD, *Circuit Judge.* In 1976, the Supreme Court recognized that the government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). And the state may not punish someone by withholding necessary care. As this court has recognized, the Eighth Amendment "safeguards the prisoner against a lack of medical care that 'may result in pain

and suffering which no one suggests would serve any penological purpose.'" *Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016) (en banc) (quoting *Gamble*, 429 U.S. at 103). The question in this case is whether Michael Thomas, who has been incarcerated in Illinois for over a decade, suffered from deliberately indifferent medical care in violation of his Eighth Amendment rights with respect to the care his prison furnished (or failed to furnish) for his broken hand and his enlarged prostate.

In this suit, which Thomas brought under 42 U.S.C. § 1983, he seeks recovery from three sources: Dr. Saleh Obaisi; Dr. Aline Martija; and the company that Illinois uses to provide prison health care, Wexford Health Sources. The district court granted summary judgment to all defendants on all claims. We agree with the dispositions in favor of Dr. Martija and Wexford. We conclude, however, that triable issues of fact remain with respect to Dr. Obaisi (who appears here through his Estate, since he died several years ago). We thus reverse and remand that part of the judgment.

**I**

Thomas broke his hand in the midst of a fight at the Hill Correctional Center on March 23, 2011. He sought and received medical care from the Hill staff, who put a cast on his hand and prescribed a low-bunk permit to avoid subjecting him to severe pain and potential further injury from the need to use his broken hand to reach the upper bunk. X-rays from May 9, 2011, showed that Thomas's hand had begun to heal but was still fractured.

On May 11, 2011, Thomas was transferred to Illinois's Stateville Correctional Center, where he remains today.

Before he left Hill, the prison officials there told him that his cast needed to be removed for the transfer, but that he would receive a new cast upon his arrival at Stateville. Thomas agreed to have the cast taken off. Upon his arrival at Stateville, however, no one recasted him. A Stateville doctor reviewed Thomas's May 9, 2011, x-ray (taken at Hill) on June 19, 2011, and concluded that the fracture remained "unresolved." That observation went unnoted. A physician's assistant looked at the same x-ray on June 30, 2011, and determined that Thomas required no further treatment. Yet a doctor's note from August 2011 described the injured hand as "still healing," and apparently things were still unresolved as of December 2011, when a doctor referred Thomas to physical therapy for his hand. Thomas received that therapy ten months later, from October to December of 2012.

Our story picks up a year later, when in November 2013 Dr. Obaisi became the medical director at Stateville; Dr. Martija joined its staff in July 2014. Thomas began seeing both Dr. Obaisi and Dr. Martija when he sought treatment and accommodations for lingering complications from his hand injury. Up until August 2014, he had kept his low-bunk permit, but it expired at that time. Asserting that he was still unable to navigate the top bunk, in October 2014 Thomas met with Stateville medical staff and asked them to renew the low-bunk permit. He also submitted formal requests through the prison's grievance system for a referral to an orthopedic specialist for lingering complications from the same hand injury. Thomas met with Dr. Obaisi on January 15, 2015, at which time he repeated his requests for the low-bunk permit and for additional treatment for his hand (even though the appointment was for his prostate condition). Thomas submitted a grievance reiterating those requests the same day.

Five months later, on June 25, 2015, Dr. Obaisi responded. He renewed Thomas's low-bunk permit in the course of another visit related to Thomas's enlarged prostate, and he agreed to refer Thomas to an orthopedic specialist. That appointment was scheduled for four months later, on October 29, 2015.

After the orthopedists at the University of Illinois at Chicago (UIC) delayed Thomas's appointment for an additional month, Thomas finally was seen there. The UIC specialist reported on November 12, 2015, that Thomas had suffered some nerve damage in his hand, with consequent diminished sensation. The specialist told Thomas that he would not have suffered such significant complications if his hand had been properly treated.

As we indicated, Thomas also suffers from an enlarged prostate—a condition he has had since at least 1996. The record shows that from 2011 to 2016 he received regular treatment from medical staff in the prison system for his prostate. He has received the drug Flomax for this condition for many years, although Thomas does not believe that the Flomax has helped much. Thomas also saw Dr. Obaisi on January 15, 2015, for a residual urine test (a procedure that reveals blockage from an enlarged prostate), but he declined the opportunity to undergo the same procedure a week later.

## II

The account of the facts we have just provided presents them in the light most favorable to Thomas, the party opposing summary judgment. The only question before us is whether these facts require judgment for the defendants, even when viewed in that favorable light, or if there is some work for the trier of fact to perform. Weighing evidence is for the

factfinder, not the court. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Kodish v. Oakbrook Terrace Fire Protection Dist.*, 604 F.3d 490, 505 (7th Cir. 2010). On the other hand, if there are no genuine disputes of fact and the record shows that the movant is entitled to judgment as a matter of law, no trial is needed. Thomas challenges the district court's grant of summary judgment in favor of all three defendants. We first consider the individual defendants, and then turn to Wexford.

## A. Individual Defendants

A prison official—including someone in the position of the doctors here—violates the Eighth Amendment "only when two requirements are met. First, the deprivation alleged must be, objectively, sufficiently serious," and second, "[the] prison official must have a sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). *Farmer* defined that state of mind as "deliberate indifference," which exists when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. In *Davis v. Kayira*, we elaborated on this standard, as it applies to an Eighth-Amendment claim based on inadequate medical care:

> [A] plaintiff might point to a number of things, including the obviousness of the risk, the defendant's persistence in a course of treatment known to be ineffective, or proof that the defendant's treatment decision departed so radically from accepted professional judgment, practice, or standards that a

jury may reasonably infer that the decision was not based on professional judgment.

938 F.3d 910, 915 (7th Cir. 2019) (cleaned up). In addition, "inexplicable delay in treatment which serves no penological interest" can support a finding of deliberate indifference in this context. *Petties v. Carter*, 836 F.3d at 730; *Grievson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008).

The district court accepted for purposes of the defendants' summary-judgment motion that Thomas's two medical conditions were objectively serious, but it concluded that Thomas had failed to present any evidence that would permit the trier of fact to conclude that either doctor acted with deliberate indifference. We too confine our attention to the latter issue.

## 1. Dr. Obaisi

Before reaching Thomas's substantive claims against Dr. Obaisi, we must clear away a procedural obstacle: what effect, if any, does the fact that Thomas is now proceeding only against Dr. Obaisi's Estate have on this case? Thomas argues that the Estate has waived any substantive defenses to his section 1983 claim on appeal because in the trial court the Estate raised only the Illinois dead man's statute in defense. That statute, Thomas contends, creates a state-law defense that applies in federal court only to matters for which state law provides the rule of decision. See Fed. R. Evid. 601; *Lovejoy Electronics, Inc. v. O'Berto*, 873 F.2d 1001, 1005 (7th Cir. 1989). Since federal law provides the rule of decision in a case under section 1983, federal law governs privilege here.

Thomas is overstating the matter a bit: the Supreme Court has instructed that state law provides the federal rule of

decision in cases under section 1983 for some issues that the statute does not address, including survivorship. See 42 U.S.C. § 1988; *Robertson v. Wegmann*, 436 U.S. 584 (1978). The parties did not mention this wrinkle, but this case is not affected by it. Thomas thoroughly briefed his substantive claims against Dr. Obaisi before both the district court and this court, and the Estate has had ample opportunity to respond. We are therefore free to proceed to the merits.

a.  Hand Injury

Thomas focuses on Dr. Obaisi's long, and in Thomas's view needless, delay both in renewing his low-bunk permit and in referring him to a specialist in response to his constant complaints of pain. It is not enough, however, simply to point to a delay, which may or may not reflect deliberate indifference. Instead, we ask how serious the condition in question was, how easy it would have been to treat it, and whether it exacerbated an injury or unnecessarily prolonged pain. *Petties*, 836 F.3d at 730–31. Delay need not be extreme; failing to provide a very easy treatment or accommodation can suffice, if unnecessary suffering resulted. See *Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004).

Failure to grant a low-bunk permit can support a finding of deliberate indifference. See, *e.g.*, *Palmer v. Franz*, 928 F.3d 560 (7th Cir. 2019); *Withers v. Wexford Health Sources, Inc.*, 710 F.3d 688 (7th Cir. 2013). Similarly, a physician's delay, even if brief, in referring an inmate to a specialist in the face of a known need for specialist treatment may also reflect deliberate indifference. See *Goodloe v. Sood*, 947 F.3d 1026 (7th Cir. 2020); *Petties*, 836 F.3d at 726. Even a delay of less than a week may be the result of deliberate indifference. See *Conley*

*v. Birch*, 796 F.3d 742, 749 (7th Cir. 2015) (five days attributable to defendant).

As our earlier account of the facts shows, Dr. Obaisi did not respond for six and ten months to Thomas's requests for the renewal of his low-bunk permit and a referral to an orthopedic specialist. This timing would allow a factfinder to conclude that Dr. Obaisi was aware of Thomas's continuing pain from the hand and consciously and needlessly delayed both measures. Thomas filed a grievance in October 2014 after meeting with prison medical professionals; that grievance covered his request for the renewal of the low-bunk permit, which had expired in August 2014, as well as his petition to see a specialist. Nothing came of it. Thomas then had an appointment with Dr. Obaisi on January 15, 2015, during which Thomas informed the doctor that he still needed a new low-bunk permit. Thomas codified this request in a formal grievance filed the same day. Dr. Obaisi finally began processing this request five months later, on June 25, 2015, after an appointment for Thomas's prostate problems, without any explanation for his earlier inaction.

Dr. Obaisi now offers several responses, but none in our view suffices to support summary judgment in his favor. First, he suggests that the evidence does not actually support a finding of *when* he knew about the permit request because his own notes from the January 2015 appointment do not mention it. But Thomas's first-hand account of that conversation is competent evidence, even if one alternatively could infer from the lack of mention in the note that the issue was not raised. A jury reasonably could conclude that Dr. Obaisi simply did not record this detail. Indeed, failing to note a request is consistent with deliberate indifference toward

that concern. Thomas's concurrent grievance immediately after the appointment also supports a finding that he did, in fact, mention his request. Again, the fact that a jury might instead conclude that Dr. Obaisi learned about the request only on June 25, 2015, during the prostate exam, just shows that there is a dispute of fact that must be resolved. Dr. Obaisi's notes from the June appointment indicate only "pain r[ight] hand post metacarpal fracture," with no mention of a request for a permit. Yet in June Dr. Obaisi did take action on Thomas's persistent request for a renewal of the low-bunk permit. A jury reasonably could conclude that Dr. Obaisi had known about the permit request for some time and, for no reason that appears in the record, simply delayed acting on it.

Dr. Obaisi also contends that Thomas failed to present concrete evidence that would permit a finding that he was forced to use an upper bunk during the period of delay. We do not read the record this way. After Thomas's low-bunk permit expired in August 2014, he made a request for its renewal in October. Thomas reiterated his plea in January 2015, both during his appointment with Dr. Obaisi and through the formal grievance channels. A jury could reasonably conclude either that Thomas had to use an upper bunk between August 2014 and January 2015, and that this is what prompted his repeated requests for the accommodation, or at a minimum that he feared an imminent loss of his now-unprotected low-bunk privilege. Or the jury might see Thomas's behavior as bad-faith pestering; we have no way of knowing without a trial. It is enough for present purposes to say that a reasonable jury could conclude that Thomas would not have persisted in his request unless he actually needed the accommodation.

But, Dr. Obaisi suggests, perhaps Thomas did not actually need the permit after January 2015, when the doctor may have first known about Thomas's request, because Thomas did not renew his request before June. That is just one possible inference from the five-month hiatus; another is that Thomas was discouraged or that he was trying to advance his request in other ways. A reasonable jury could conclude that a person who already had asked twice for a renewed permit and had submitted grievances formalizing that request still needed the permit. It could also find, on this record, that the delay would expose him to pain by forcing him to use his poorly healed broken hand to climb to an upper bunk.

### b.  Specialist Referral

The evidence would also permit a jury to conclude that Dr. Obaisi acted with deliberate indifference by unnecessarily delaying referring Thomas to an orthopedic specialist. Recall that Thomas asked for this referral in October 2014 and January 2015 when he saw Dr. Obaisi, and that he documented those requests through the formal grievance process. Dr. Obaisi finally began the referral process on June 25, 2015. A jury could conclude that Dr. Obaisi learned about this request as early as the January appointment or through Thomas's grievance filed immediately after that appointment, yet inexplicably failed to act for many months.

Dr. Obaisi contends that he was not responsible for the delay; instead, he says, it was the fault of the UIC orthopedist. He suggests that the orthopedist may not have had an opening before October 2015, and that it was UIC, not himself, that rescheduled the appointment for November. All this is to say that there are facts that need to be resolved. It is enough for now that there is evidence supporting two possibilities:

either that Dr. Obaisi was deliberately indifferent to Thomas's needs and caused this delay, or that administrative issues beyond his control were to blame. Moreover, one cannot blame the orthopedists for delays before June 2015, when Dr. Obaisi initiated the referral process.

Although *Farmer* requires only a showing of a substantial risk of harm to an inmate, it is still necessary to link that harm or the risk thereof to the defendant. Thomas has done so in two ways. First, he relies on the rule that a cognizable injury exists where an inmate presents "independent evidence that the delay exacerbated the injury *or* unnecessarily prolonged pain." *Petties*, 836 F.3d at 730–31 (citing *Williams v. Liefer*, 491 F.3d 710, 716 (7th Cir. 2007)) (emphasis added). Dr. Obaisi's delay, he contends, unnecessarily prolonged his pain while he was waiting for the orthopedist's treatment plan, which ultimately included splinting his hand and pursuing physical therapy. Second, Thomas points to medical reports from his visit with the orthopedist. Those reports indicate that Thomas suffered from diminished sensation in his fingers and healing abnormalities, and they note that Thomas's fracture had "not completely healed." A jury could conclude that the delay in adequately treating Thomas's hand injury led to nerve damage and improper healing. Failure to provide necessary relief and delaying access to a qualified specialist can lead to prolongation of pain. See *Goodloe*, 947 F.3d at 1032; *Petties*, 836 F.3d at 731–32; *Conley*, 796 F.3d at 749.

Dr. Obaisi pushes back against the proposition that the injuries the orthopedist documented are fairly traceable to anything he did or failed to do. When asked whether the damage "was due to the original breaking or due to the recovery after that," the orthopedist told Thomas that his

nerve damage resulted from "the original breaking." But a jury reasonably could conclude that this meant only that the recovery process did not cause *additional* damage. That possibility is consistent with the theory that the original break caused the nerve damage because it was ignored for too long.

Thomas's case is also not undermined by the fact that he did not complain about his hand for two years and then again noted significant pain in October 2014 and January 2015. A jury could conclude that he suffered a setback caused by imperfect healing and that Dr. Obaisi's failure to act with any sense of urgency exacerbated the injury.

Taking another tack, Dr. Obaisi suggests that Thomas was responsible for his problems in 2015 because he got into a fight in March of that year and punched another inmate. Thomas may have used his formerly broken hand and caused all the damage the orthopedist documented in November 2015. But Thomas complained of significant pain in his hand in October 2014, well before the new fight, and he formally asked to be seen by a specialist then and again in January 2015. No fight two months after the later date could have affected that course of events. It is also worth noting that nothing in the record reveals which hand Thomas used during the March 2015 incident.

Dr. Obaisi calls our attention to a potential typographical error in the medical report from the orthopedist and asks us to draw an inference favorable to him from that supposed glitch. On November 12, 2015, the orthopedist indicated that the fracture "has now completely healed." But notes from Thomas's next appointment with the same doctor on September 1, 2016, indicate that new x-rays showed that the fractures in his hand "[were] *not* completely healed, but are

shortened." The defendants want us to read the "not" in the second note as a typo and to instead insert "now," which would be consistent with the earlier note. (One could also change the first note's "now" to a "not," for that matter.) But we must take all inferences in the light most favorable to Thomas, and from that perspective, the later note just indicates that the new x-rays furnished additional information about his condition. Support for the latter view also comes from a radiology report from a September 1, 2016, appointment; that record indicates that the x-rays from November 12, 2015, and September 1, 2016, revealed "redemonstrations" of the bone injury. With this before it, a jury could conclude that the hand had never fully healed (and so was susceptible to repeated re-injury), and thus that Dr. Obaisi's delay referring Thomas to a specialist unnecessarily prolonged his pain.

Dr. Obaisi argues finally that he cannot be held responsible for any additional suffering because the orthopedist's treatment plan mirrored the one the prisons initially followed in 2011 and 2012—that is, the use of a splint and occupational therapy. But if anything, a reasonable jury could conclude that a person who broke his hand in 2011 would not normally need to be splinted in 2015 or to receive additional physical therapy in 2016. From this, a jury might conclude that Dr. Obaisi acted with deliberate indifference by delaying his referral of Thomas to someone qualified to address the new pain in 2014 and 2015 from this old injury.

### c.  Prostate

Thomas's last complaint against Dr. Obaisi concerns the doctor's response to his enlarged prostate. He had been getting Flomax from various doctors since as early as January

2012. Dr. Obaisi, and later Dr. Martija, continued that prescription, but Thomas complained that it was ineffective and that the doctors knew this. He supports his allegation of knowledge with several medical records. First, a Wexford medical professional's ultrasound referral for his prostate on January 5, 2012, indicated that Thomas "failed initial medication trials with … Flomax." This note suggests, according to Thomas, that doctors in the Wexford system had known since at least January 2012 that Flomax was ineffective for him. Second, Dr. Obaisi noted during an appointment on June 25, 2015, that Thomas "ha[d] been off Flomax which reduced nocturia." Nocturia is a condition that causes the person to wake up frequently during the night to urinate; it is associated with an enlarged prostate (among other things). Thomas contends that a reasonable jury could find that Dr. Obaisi concluded that Thomas would suffer less from nocturia if he was taken off Flomax. Nonetheless, Dr. Obaisi (and later, Dr. Martija) continued to prescribe Flomax rather than explore alternative treatment plans.

Persisting in treatment known to be ineffective can constitute deliberate medical indifference, provided that the doctor was subjectively aware that the treatment plan was ineffective. *Petties*, 836 F.3d at 729–30; *Goodloe*, 947 F.3d at 1031. It is not enough that the plaintiff simply believes the treatment was ineffective or disagrees with the doctor's chosen course of treatment. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006); *Estelle v. Gamble*, 429 U.S. 97, 107 (1976). The challenged plan must deviate so substantially from accepted professional judgment that no reasonable physician would reach the same judgment. *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011).

For this part of the case, we agree with the district court that no jury could conclude that Dr. Obaisi acted with deliberate indifference when he chose to continue the Flomax prescription. Dr. Obaisi was not alone in his judgment that this was the proper drug. Dr. Martija came to the same conclusion, as did Thomas's earlier doctors. The one note to which Thomas points is not enough to create a jury issue. Even if Thomas's nocturia was temporarily reduced while he was not taking Flomax, trade-offs are common in medicine, and the evidence in this record indicates that Flomax is a widely accepted treatment for an enlarged prostate. Indeed, Thomas asked for additional Flomax prescriptions when his prescription ran out in May and June of 2015.

## 2. Dr. Martija

We can be briefer with Thomas's claims against Dr. Martija, because she was not as involved in his treatment. We begin, as before, with the hand injury and the associated complaints about the low-bunk permit and the specialist referral. The extension of the low-bunk permit that Dr. Obaisi granted expired on December 26, 2015. Shortly thereafter, Thomas asked Dr. Martija to renew it. Dr. Martija's notes from Thomas's appointment with her on January 22, 2016, reveal that she renewed the permit. Nothing in the record would permit a finding that Dr. Martija learned of Thomas's renewal request any earlier than January 22, 2016, and so no jury could conclude that she acted with deliberate indifference during the one-month period between the expiration of the permit and her renewal. Similarly, by November 2015 Thomas had seen the UIC orthopedist; Dr. Martija had nothing to do with any delays in that process.

Finally, with respect to the enlarged prostate, all that Dr. Martija did was to continue the prescriptions of Flomax. Thomas alleges that she ignored the presence of records dating as far back as 1996 reporting that he suffered from an enlarged prostate. Those records show that he had benign prostatic hyperplasia (BPH) (*i.e.* an enlarged prostate), and a January 2012 ultrasound confirmed this diagnosis. Dr. Martija seems to have had some reservations about this assessment, because she wrote after Thomas's appointment in May 2015 that she saw "no basis for BPH." But she did not act on that skepticism. Instead, she prescribed Flomax and offered to conduct standard tests to determine the seriousness of his condition. She also reviewed Thomas's medical records and determined that nothing required more aggressive action. She ordered a follow-up residual urine test in June 2015 with Dr. Obaisi. Neither doctor thought that the results of this test required a change in Thomas's treatment.

This course of events, even construed favorably to Thomas, does not reflect deliberate indifference. The district court thus correctly granted summary judgment in favor of Dr. Martija.

## B. Wexford

We turn finally to Thomas's claims against Wexford. The critical question for finding a corporation liable under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978), "is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc). *Monell* recognizes three primary ways in which one might prove that the corporation or municipality itself inflicted the harm. First, the

plaintiff may show that the alleged unconstitutional conduct implements or executes an official policy adopted by the entity's officers. *Monell*, 436 U.S. at 690; see also *Glisson*, 849 F.3d at 379 (quoting *Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 35 (2010)). Second, the plaintiff may show that the unconstitutional action was done pursuant to a custom—even one that is not formally codified. *Monell*, 436 U.S. at 690–91. Finally, the plaintiff may prove that an actor with final decision-making authority within the entity adopted the relevant policy or custom. *Id*. at 694; see also *Vodak v. City of Chicago*, 639 F.3d 738, 747 (7th Cir. 2011).

The district court found that Thomas could not satisfy any of these approaches and thus could not proceed on his claim against Wexford. It added that *Monell* liability is unavailing because, as it saw things, none of the individual defendants was liable, and municipal liability requires an underlying constitutional violation. *Petty v. City of Chicago*, 754 F.3d 416, 424–25 (7th Cir. 2014).

We find no merit in Thomas's arguments to the contrary. He contends that the failure of the doctors at Stateville to provide the treatment of his hand that the Hill staff promised as a condition for his transfer reveals a custom of deliberate indifference. We have described that transfer earlier and see no need to repeat the details. It is enough to say that this single incident of a lapse in follow-up medical care is not enough to show either a formal policy on Wexford's part or an informal custom.

Thomas also urges that Dr. Obaisi was the final policymaker for Stateville. He reads our holding in *Petties* as confirming that the medical director of a particular facility is a final decisionmaker for *Monell* purposes. *Petties* held that the

plaintiff had alleged enough to proceed in an individual suit against Dr. Imhotep Carter, who was then serving as Stateville's medical director. But the defendant in *Petties* was Dr. Carter, individually; it was not Wexford, his employer. The fact that Dr. Carter was following (or not) certain procedures prescribed by Wexford was pertinent to the deliberate indifference analysis, but it did not sweep Wexford in as a defendant. There is no evidence supporting the counter-intuitive idea that Wexford, the corporation, has as many "final" decisionmakers as it has prisons. Nothing in the record supports a finding that an institution-level medical director sat at "the apex of authority" for Wexford's transfer policies. See *Vodak*, 639 F.3d at 748.

Finally, Thomas alleges that Wexford's failure to establish a policy designed to coordinate treatment between facilities when an inmate is transferred constitutes deliberate medical indifference. It is true, as we held in *Glisson*, that the decision *not* to have a policy can itself be a policy for *Monell* purposes. 849 F.3d at 379. But here Thomas has not presented any evidence that would permit a jury to find that Wexford had a policy not to provide coordinated care. All we know is that in Thomas's case, after he arrived at Stateville the transferee doctors said that they did not know that the transferor personnel had promised Thomas that he would receive a new splint. But the Stateville staff did not ignore Thomas; they performed their own medical assessment and concluded that he did not need a new splint. That may have been good medical care, or not, but it does not support a finding that an overriding policy was driving their decisions.

**III**

We REVERSE the district court's grant of summary judgment in favor of Dr. Obaisi and REMAND the case against his Estate for further proceedings consistent with this opinion. We AFFIRM the district court's judgment in favor of Dr. Martija and Wexford Health Sources.