**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted July 8, 2021[*]
Decided July 29, 2021

**Before**

WILLIAM J. BAUER, *Circuit Judge*

DIANE P. WOOD, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 21-1114

LAVALL T. LEE,
    *Plaintiff-Appellant*,

    *v.*

WILLIAM JAMES and EDWARD JONES,
    *Defendants-Appellees*.

Appeal from the United States District Court for the Eastern District of Wisconsin.

No. 1:20-cv-00396-WCG

**William C. Griesbach**,
*Judge*.

## O R D E R

A prison guard used pepper spray on Lavall Lee after he was restrained face-down on the ground. Lee then sued several guards, asserting that the use of the spray and his later escort to segregation violated his rights under the Eighth Amendment. *See* 42 U.S.C. § 1983. The district court entered summary judgment for the guards, concluding that nothing suggested they used force for any purpose other than to restore

---

[*] We have agreed to decide the case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

order. But Lee's evidence creates a factual dispute over why the guard deployed the spray, so we vacate the judgment as to him. We affirm in all other respects.

The events are disputed; we present the version that favors Lee, the party against whom summary judgment was entered. *Thomas v. Martija*, 991 F.3d 763, 767 (7th Cir. 2021). On the day in question, Lee was involved in two fights at Racine Correctional Institution. After the first, he was ordered to return to his cell. A short while later, guards instructed him to report to his unit's dayroom so they could escort him to the Restricted Housing Unit. As he came down the stairs from his cell toward the sign-out podium, he lunged at another inmate standing nearby.

Guards intervened immediately. They pulled Lee to the ground and radioed for assistance. When Officer William James arrived on the scene, Lee already was secured, face down on the ground, underneath a pile of five guards. Guards told James that Lee was cooperating and that they had the situation under control. Nonetheless, James drew his pepper spray. Guards pleaded with him not to use it, but James yelled "No, I got this!" and dispensed the spray less than two inches away from Lee's face. The burst hit Lee in the eyes, causing him severe pain.

Captain Edward Jones, who also responded to the radio call, arrived in time to see guards coughing amid a cloud of spray. He ordered staff to escort Lee quickly to the Restricted Housing Unit. Lee says that he was dragged away in shackles, still blinded by the spray. At the Restricted Housing Unit, Captain Jones put Lee in a shower and told him to flush his eyes. Lee complained that the water was too hot and further irritated his eyes. By this time Jones's shift had ended. He told health services to follow up with Lee but did not stay to ensure that any nurses arrived. Lee then told another guard at the Restricted Housing Unit that his eyes burned and that he was having trouble breathing. He received no medical attention. His pain lasted two hours.

Retrospective accounts of the incident vary. For instance, Captain Michael Giernoth, who conducted a review of the facility's use of force, found that James's actions were "justified." But in internal emails to Michelle Bones (an inmate-complaint examiner who had received a grievance from Lee), Captain Giernoth also wrote that the spray was "not needed." Bones, for her part, thought that James was "in the wrong" based on her own review of reports about the incident, and she asked a second officer to review Captain Giernoth's finding. Also, James's own account of events shifted over time. In an incident report, revised several times, he said he used the spray only after issuing a warning that Lee resisted. But in a later declaration, James asserted that other

guards told him to use the spray after asking for handcuffs while they wrestled Lee to the ground.

About a month after the incident, Lee filed a health-services request, complaining that he had developed headaches and blurry vision in his right eye. An eye examination was normal. A nurse told Lee to follow up with health services if he had further issues, but he filed no further requests for these complaints.

Lee then sued James and Jones for excessive force over use of the spray and his escort to segregation. (He named several other defendants in his complaint, but the district court dismissed the claims against them at screening, *see* 28 U.S.C. § 1915A, and Lee does not challenge those dismissals.)

The parties eventually filed cross-motions for summary judgment, and the district court entered summary judgment for the defendants. The parties disputed whether Lee was restrained when he was sprayed, whether he was sprayed in the face or on the shoulder, and whether other guards told James to use the spray. But these disputes were immaterial, the district court believed, because Lee did not deny that he resisted the efforts to restrain him. In the court's view, there was no question that James used the spray to restore order and, regardless, Lee had not sustained any significant injury. Further, any discomfort inflicted by the spray was "short-lived, even if painful," and the officials tried to minimize the harm by giving Lee access to a shower to rinse his eyes. As for Jones, no evidence showed that he transported Lee to the Restricted Housing Unit in an unreasonable manner. And to the extent Lee meant to raise a deliberate-indifference claim against Jones, the court had not identified that claim at screening as one that could go forward.

To reach a jury on his excessive-force claims, Lee needed to submit evidence that the guards' actions were malicious attempts to inflict suffering rather than good-faith efforts to restore discipline. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Not every "malevolent touch" by guards implicates the Constitution, *id.*, but the infliction of pain is per se malicious if it is done "totally without penological justification." *Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004) (internal citations omitted).

We begin with the claim against James. Lee contends that the district court overlooked evidence creating material factual disputes over James's motivation for deploying the spray. Lee points, for instance, to declarations by two fellow inmates, stating that he was secured and cooperative and that guards had told James as much before he deployed the spray. Second, Lee refers us to allegations in his verified

complaint, swearing that he was "at ease" on the ground while guards pleaded with James not to spray. (Factual allegations in a verified complaint can be admissible evidence at summary judgment. *E.g.*, *Ford v. Wilson*, 90 F.3d 245, 246–47 (7th Cir. 1996).) Finally, Lee says, internal emails from Giernoth and Bones support his view that James acted in bad faith.

We agree with Lee that this evidence creates a fact question over whether James acted with malice in deploying the spray. The district court here concluded that there was no constitutional violation, but it did so by crediting James's account that he used pepper spray during a chaotic encounter with a combative inmate who was resisting efforts at restraint. At summary judgment, however, the court must construe the evidence in the light most favorable to Lee. *Thomas*, 991 F.3d at 767. On Lee's telling he was fully restrained and compliant—and order had been restored—well before James arrived on the scene. Upon his arrival, however, James caused events to spiral: He ignored the other guards' reports that the situation was under control, defied their requests not to use the spray so close to them, and proceeded anyway to pepper-spray Lee in the face. Under these circumstances, a reasonable jury crediting Lee's version could infer that the need for force was not so obvious that it excluded the possibility of a malicious motive. *Lewis v. Downey*, 581 F.3d 467, 477–78 (7th Cir. 2009) (tasering prone inmate who was slow to comply with orders could be excessive); *see also Dean v. Jones*, 984 F.3d 295, 304–05 (4th Cir. 2021) (pepper-spraying a fully restrained, face-down inmate who headbutted officer raised inference of malice). Our conclusion is bolstered by—but does not depend on—James's shifting accounts of the incident, the curious absence of any affidavits from fellow guards corroborating any of those accounts, and Giernoth's and Bones's evident belief that the use of force was unnecessary. *See McCottrell v. White*, 933 F.3d 651, 667 (7th Cir. 2019) (shifting stories by guards can support inference of lying). Of course, how a jury ultimately chooses to weigh this evidence is not for us to say.

James counters with three arguments, but none persuades us. First, he asserts that Lee does not deny being involved in an altercation with another inmate or staff, so the use of pepper spray cannot be unreasonable. But by Lee's account, he was complying with orders and "at ease" on the ground by the time James arrived. Second, James argues that the force could not have been excessive because Lee did not incur any significant injury. But the significance of an injury is not the dispositive factor in an excessive force inquiry; the "core judicial inquiry" is whether the force was applied in good faith. *Hudson*, 503 U.S. at 7, 9 ("When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. This is

true whether or not significant injury is evident." (internal citations omitted)); *see also Wilkins v. Gaddy*, 559 U.S. 34, 37–38 (2010) (vacating dismissal of excessive force claim because of erroneous focus on extent of injury over nature of force applied). Third, James asserts that guards made reasonable efforts to temper the effects of the spray by taking Lee to a shower and having him rinse his eyes. But those steps by other guards do not resolve whether force was necessary in the first place.

Alternatively, James contends that he is entitled to qualified immunity because the law is unclear whether a single burst of pepper spray can be excessive. It is not: No reasonable guard would think using such force on a docile and restrained inmate was justified. *Lewis*, 581 F.3d at 479. We are mindful that the infliction of pain to maintain order is not excessive simply because the use of force in retrospect appears unnecessary. *Whitley*, 475 U.S. at 319. And we have previously approved the use of chemical agents to subdue recalcitrant prisoners. *See Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984). But by Lee's account he was neither resisting nor recalcitrant.

Lee's claim against Jones fares differently. Lee asserts that the district court ignored Jones's admissions that he left Lee in a hot shower with pepper spray in his eyes and then went home. But these assertions do not bear on whether Jones's actions in transporting Lee to segregation were unreasonable. In the district court, Lee contended that Jones violated prison regulations during the escort. Yet not every violation of a prison regulation offends the Constitution. *Whitman v. Nesic*, 368 F.3d 931, 935 n.1 (7th Cir. 2004). We have independently reviewed the record and see nothing to suggest that Jones acted with ill intent in removing Lee from the dayroom—or that Jones used force at all. To the extent Lee meant to assert a deliberate-indifference claim against Jones for not waiting to ensure that medical staff would come, the evidence reflects negligence at worst. As we understand the record, Jones tried to allow Lee to rinse the spray from his eyes and get him medical care before leaving him in the care of another guard. And negligence alone is not enough to support a claim for deliberate indifference. *Figgs v. Dawson*, 829 F.3d 895, 903 (7th Cir. 2016).

For the foregoing reasons, we VACATE the judgment in favor of James and remand for further proceedings. We AFFIRM the judgment in all other respects.